THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GABRIEL BEDOYA, Defendant-Appellant.

First District (4th Division)   No. 1—96—1012

Opinion filed May 1, 1997.

Richard S. Kling, of Law Offices of Chicago-Kent College of Law, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Maria D. MacKenzie, and Clare Wesolik Connolly, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE WOLFSON delivered the opinion of the court:

Gabriel Bedoya (Bedoya) and John Koch (Koch), both Milwaukee police officers, came to Chicago on May 26, 1994, for a night out on

the town. Before the night was over, the Claridge and Ambassador Hotels and the Cardinal's residence were riddled with gunshots. A bouncer at the Dynasty Lounge was dead. Whether Bedoya was to be held responsible for these events was at issue at his trial.

Bedoya was charged with four counts of aggravated discharge of a firearm and one count of first degree murder as a result of the events of May 26 and 27, 1994. A jury found him guilty of murder, but not guilty on the remaining counts. Bedoya was sentenced to 30 years' imprisonment. It is from this conviction and sentence that he appeals.

He raises as issues: (1) whether the trial court erred by refusing to allow Bedoya to present evidence of the victim's past acts of violence, when self-defense was raised and the jury was instructed on self-defense, and (2) whether Bedoya's defense for first degree murder was substantially prejudiced by the trial court's refusal to sever the counts for aggravated discharge of a firearm. We reverse and remand for a new trial.

## FACTS

At trial, the State's first witness was Beatriz Rodriguez (Beatriz). She testified that she had been the wife of Jose Julian Rodriguez (Rodriguez), who was shot on May 27, 1994, while he was working as a bouncer at the Dynasty Lounge at 5447 N. Lincoln in Chicago. Beatriz testified that in the early morning hours of May 27, 1994, at about 2 a.m., she called the public phone located in the entranceway of the Dynasty bar. While she was speaking with her husband, he stopped the conversation and asked her to hold. At first, Beatriz heard nothing, then she heard some noises and heard someone say, "What's wrong with him? He's bleeding." When Rodriguez did not return to the phone, Beatriz hung up and called the Dynasty bar's main phone. She spoke with the bartender and learned that her husband had been shot.

Beatriz said that she drove to the bar immediately, but the police would not let her see her husband. The next time she saw Rodriguez, she identified his body at the morgue.

Carlos Varela, a Chicago patrol officer for the 20th District, testified that he had been at the Dynasty Lounge on the evening of May 26, 1994. He got off work at about 11 p.m. and went to have some drinks before going home. He was at the bar for about an hour and, he said, the bar was rather empty.

Varela testified that he saw Bedoya, whom he had known for 15 or 16 years. Though Bedoya grew up in Chicago and had family here, Varela knew that Bedoya was a Milwaukee police officer. Bedoya

came over to say hello and introduced Varela to his companion, Koch, whom Varela had never seen before. Bedoya introduced him as "a co-worker."

Bedoya asked Varela if he could suggest a bar where there was music and more action. Varela told them about a bar downtown. Bedoya and Koch left the Dynasty. Varela did not see them again that night.

At 2:30 or 2:45 a.m., however, Varela received a phone call from a Chicago police detective. Because of the call, Varela went back to the Dynasty bar around 3 a.m. and spoke with detectives who were there investigating a shooting. He told the detectives Bedoya's name, the name of a bar belonging to Bedoya's uncle, and other information about Bedoya.

On cross-examination Varela denied that he saw Bedoya carrying a gun the night of May 26, 1994. He said that when Bedoya first became a Milwaukee police officer Bedoya came to Varela's Chicago police station wearing his gun. Varela told Bedoya at that time that he could not carry a gun in Chicago.

Koch testified for the State at Bedoya's trial. He told the jury that he had been dismissed from the Milwaukee police force after he pled guilty to the offenses of aggravated discharge of a firearm, obstruction of justice, and aiding a fugitive, in relation to the events of May 26 and 27, 1994. He also admitted that he had a charge of criminal damage to property pending against him in Wisconsin in relation to an incident involving an ex-wife.

Koch testified that he and Bedoya became friends after being partners on the Milwaukee police force. In May 1994 Bedoya and Bedoya's girlfriend were living with Koch in Koch's condo in Milwaukee. At about 8:30 p.m., on the evening of May 26, 1994, Koch and Bedoya left Milwaukee and arrived in Chicago at about 10 p.m. They drove to Chicago in Koch's red Toyota Camry. Koch said they planned to stay at Bedoya's mother's home in Chicago after enjoying themselves at some bars in Chicago.

Before leaving Milwaukee, Koch said, both he and Bedoya drank four to five gin and tonic cocktails. On the way to Chicago, they bought a six-pack of beer and shared it.

Both Koch and Bedoya came to Chicago wearing their service weapons, .40-caliber Glock semiautomatic pistols. Koch wore his concealed in an off-duty holster worn in the small of his back. Bedoya wore his weapon in a regulation off-duty, side holster.

Their first stop on arriving in Chicago was the Casanova Lounge, a bar run by Bedoya's uncle. Koch testified that he and Bedoya were drinking gin and tonic that night. They each had two drinks at the

Casanova. After leaving the Casanova bar, they drove to the Dynasty Lounge. There was a bouncer at the door who checked IDs and frisked people for weapons. Koch said that Bedoya showed the bouncer his badge and told him that they were police officers. The bouncer let them into the bar with their weapons.

Inside the bar, Bedoya saw a friend, Carlos Varela, who was a Chicago police officer. Bedoya asked Varela to suggest the name of a bar with good music, since the Dynasty was rather empty. Varela suggested Mother's Lounge. Koch and Bedoya left the Dynasty and Bedoya began to drive to Mother's.

On the way to Mother's Lounge, Koch said, he placed his gun in the glove compartment because he "wasn't comfortable." Bedoya drove the car through an area where prostitutes were walking along the street. Koch directed Bedoya to stop. He picked up a prostitute and paid her $10 for her to perform an act of oral sex on him in the back of the car. Bedoya drove the car while Koch and the prostitute were in the back seat. Because Koch had difficulty maintaining an erection, he told the prostitute to get out of the car. Koch and Bedoya then continued on their way to Mother's Lounge.

At Mother's, Koch said, he and Bedoya had two to three drinks. Koch said that he danced and watched other people dancing. At some point, however, they decided to leave Mother's. As they walked to their car, Koch said, Bedoya pulled out his weapon and shot at the ground twice. Koch said that he asked Bedoya why he was shooting and Bedoya just laughed and said, "This is a city, they'll never catch us."

Bedoya drove again. Koch was tired and began to doze off. The next thing he remembered, Koch said, he woke up to see Bedoya reaching across the car in front of him, shooting out of the passenger window of the car. Koch said this happened several times but he did nothing to stop Bedoya.

After shooting at several buildings, Bedoya drove back to the Dynasty Lounge. Koch and Bedoya went inside and had one drink. Koch said that he was sitting at the bar when he realized that Bedoya had gotten up and was leaving. He started to follow. When he got outside he saw that Bedoya and the bouncer were fighting and shouting at each other in Spanish, which Koch did not understand. Koch said he tried to hold on to the bouncer's arms to pull him off Bedoya, but got "shrugged off." When he tried to grab the bouncer again, he heard a gunshot. The bouncer, Koch said, said something in Spanish, let go of Bedoya, and turned around and walked back toward the bar. Because of his position, Koch had not seen the gun and did not know who was holding the gun when it fired.

Koch testified, however, that after the bouncer walked away he noticed Bedoya holstering his weapon and walking at a fast pace up the street. When Koch caught up with him, Bedoya said, "I shot the m- - - - - f- - - - -, We've got to get out of here." Koch then went to get the car, drove to where Bedoya was standing, and picked him up. Koch said that he heard sirens and saw emergency lights flashing as he drove away from the area near the Dynasty Lounge.

After leaving the Dynasty Lounge, Bedoya suggested that they switch places. Bedoya drove. After that, said Koch, he had absolutely no recollection of anything until he awoke the next morning in his car in the parking lot of his condo in Milwaukee. He woke up when a Milwaukee police officer opened the car door he had been leaning on and he started to fall out of the car. He noticed that there were several officers and detectives around the car. Koch was arrested. The detectives retrieved Koch's service weapon from the glove compartment.

Koch admitted that when he awoke he was covered with vomit from throwing up on himself and his pants were urine-soaked.

On cross-examination Koch denied that he had been the one shooting out of the passenger window at the buildings. He could not explain, however, how a bullet hole got in the arm rest of the passenger side of the car.

Koch also said that he was 5 feet 9 inches tall and he recalled the bouncer being taller than he was.

The bartender at the Dynasty, Jose Marin Lopez, testified with the help of a Spanish interpreter. He said that he had been a bartender at the Dynasty for seven years and was there on May 26, 1994. He saw Carlos Varela speaking with two men Lopez did not know. These men ordered one drink and then left.

Around 2 a.m., the two men he had seen with Varela earlier came back into the bar. They ordered a drink and stayed for 10 or 15 minutes. When they left the bar, Lopez noticed that there was only one glass left on the bar.

Lopez testified that he noticed Rodriguez talking on the phone in the front entranceway of the bar around the time that the two men came back to the bar. Later, when the two men left, he was surprised when he looked through the front window and saw Rodriguez outside. Lopez said that he went outside to see what was going on. He saw Rodriguez "battling" with the two men who had been in the bar. Rodriguez was up against a car, he said, and Bedoya had a gun in his hand. Koch was behind Rodriguez. According to Lopez, Bedoya was holding the gun in the air and was trying to force it down. Rodriguez was holding Bedoya's wrist, trying to push the gun away.

Lopez said that he ran inside the bar and told the disc jockey to call the police. Before he could get back outside, he heard a shot. The next thing he saw was Rodriguez walk in through the front door and fall on his face to the floor. The police and an ambulance arrived soon after. Later that same morning, Lopez traveled with some Chicago police detectives to Milwaukee, where he viewed a lineup and identified Bedoya as the man he had seen with the gun.

The rest of the evidence produced at trial by the State concerned the shootings that occurred at the Ambassador and Claridge Hotels and the Cardinal's residence. In addition to testimonial evidence from several witnesses, the State offered into evidence the recovered bullet casings and numerous photographs of the damage to the buildings. No one, however, testified to actually seeing the shootings take place. No one was able to say whether it was Bedoya or Koch who had been shooting from the passenger window of the car. The evidence established that the shots fired at the buildings, as well as the shot that killed Rodriguez, were all fired from Bedoya's gun.

Assistant Cook County Medical Examiner Dr. Nancy Jones testified that she performed an autopsy on the body of Jose Julian Rodriguez on May 27, 1994. From her examination of the body she determined that he was a 23-year-old, Hispanic male, weighing 214 pounds. He was 5 feet 7 inches tall.

Rodriguez died as a result of a single, through and through gunshot wound to the chest. The bullet passed through the left lobe of the liver, the stomach, the diaphragm, the pericardium, the heart, and the lung. The bullet traveled through the body in a straight and level path, slightly angled from right to left. There was charring at the entrance site, indicating that the shot had been "close contact."

The body also showed some evidence of blunt trauma to the face and neck. There was a laceration at the left temple, a laceration inside the upper lip, a bruise on the inside of the lower lip, exterior abrasions of the lips, and a linear scratch on the neck.

On cross-examination, the medical examiner said that some of these injuries were consistent with Rodriguez's fall to the ground after being shot.

Rodriguez's blood was tested. His blood-alcohol content was .33 milligrams, he had no cocaine in his system, but his blood did show the presence of .17 micrograms of benzoylecgonine, a by-product of cocaine. Dr. Jones said that without knowing the amount of cocaine Rodriguez had ingested she could say only that it had been at least one hour, but could have been up to 24 hours, since he ingested the cocaine.

For his defense, Bedoya produced Lesa Northam as a witness.

She said that she was a Highland Park police officer and, in the early morning hours of May 27, 1994, she stopped a red car driving on the Edens Expressway because she felt it was following another car too closely. Northam said that she pulled up behind the vehicle and activated her lights, but the driver of the car did not pull over. He stuck his arm out the window and displayed a badge. Northam tapped her sirens and the car then pulled over.

Northam said that there were two people in the car. She asked the driver, whom she identified as Bedoya, if he had a valid picture identification for the badge and Bedoya produced this. She noticed the passenger was slumped over, his head was between his knees, and he smelled of alcohol and vomit. She asked the driver if he, too, had been drinking and Bedoya admitted that he had. She then administered a field sobriety test to Bedoya. Because Bedoya passed this test and did not appear intoxicated, Northam felt he was capable of driving and did not ticket him or arrest him. She did suggest that he stop at a nearby Denny's restaurant and check on his companion, who looked extremely intoxicated.

Bedoya also presented the testimony of firearms examiner Richard Fournier. He testified that spent casings are ejected from the right side of a Glock 22 semiautomatic pistol. This meant that, had Bedoya been leaning across Koch and shooting out the passenger window of the car, the spent casings would have been flying into the face of Koch, who was sitting in the passenger seat.

Bedoya testified on his own behalf. Though his account of the evening of May 26, 1994, and morning of May 27, 1994, was similar to Koch's account, it differed on specific points. Because he lived with Koch and they had the same work schedule, he and Koch were together almost 24 hours a day. From this close relationship with Koch, Bedoya learned that Koch was an alcoholic. He said that Koch drank every morning and again when he got home from work.

On May 25, 1994, Koch worked, though Bedoya did not. Koch got home on Thursday morning, May 26, 1994, at about 8 a.m. When he came home he had a beer and went to bed. Koch woke up around noon and told Bedoya he would cook dinner later that evening. Koch had some beer and some wine and went back to bed until 6 p.m.

When Koch got up the second time, he cooked dinner. He began drinking gin and tonic. Bedoya also had some drinks at this time.

Around 8 p.m., Koch suggested that they go to Chicago. Bedoya agreed. They left in Koch's red Toyota Camry. Once they arrived in Chicago, their first stop was at Bedoya's uncle's bar, the Casanova, at 2400 West Lawrence. Bedoya said that he and Koch had discussed the possibility of opening a fancy nightclub in Milwaukee that would

cater to the Hispanic population. For this reason, he showed Koch around the bar. While they were at the Casanova they each had one drink.

After leaving the Casanova, they went to the Dynasty Lounge, which is owned by a friend of Bedoya's. Bedoya denied that the bouncer was at the door when they came in. Inside, however, he saw a friend, Carlos Varela. He stopped to talk with Varela and introduced Koch to him. After talking with Varela, Koch and Bedoya left the Dynasty, planning to look at other Spanish nightclubs.

When they left the Dynasty, Koch indicated that he wanted to see Division Street. Bedoya agreed to show him around. As Bedoya directed Koch where to turn, he pointed out the features of the different areas. Near the Uptown area, around Broadway and Lawrence, Koch noticed a number of prostitutes on the street. He pulled the car over and struck up a conversation with one of the prostitutes.

Koch gave Bedoya his weapon and wallet and got into the back seat with a prostitute. Bedoya moved over to the driver's seat and drove away. Very soon after, however, the prostitute told Bedoya to pull over and she got out. When she left, Koch was swearing and very angry. Bedoya said Koch was upset because women didn't like him and he was unable to perform when he was with a woman.

Bedoya continued to drive toward Division Street, where they found a bar called Mother's. Inside this bar they were stopped by the bouncers at the door. Bedoya and Koch informed the bouncers they were carrying weapons because they were off-duty police officers. They produced their identification. The bouncer directed them to one of four bars in the place.

After ordering some drinks, Koch got up and began to dance with a couple of girls on the dance floor. When the song ended, Koch bought himself and the girls some drinks. The girls refused to accept his drinks, refused to dance with him, and walked away. Koch became extremely depressed and angry. He drank all of the drinks, including the ones he had purchased for the girls, and became "wasted" or extremely intoxicated. Bedoya decided it was time to leave and started for the door. But Koch stopped to talk with some other girls and ordered more drinks. Koch appeared to be "bothering" these girls. Johnny "Red" Kerr came over and said the girls were with him. Bedoya excused himself and Koch and they left the bar.

Bedoya denied that he fired his weapon outside Mother's bar. He said that he "had more sense" than that. He decided to drive because Koch was too intoxicated. He drove away from Mother's bar, intending to go home. In preparation for the long ride home, he took off his gun and placed it on the seat next to him.

As Bedoya was driving along, trying to find his way back to the highway, he heard a shot. He looked over and saw that Koch was firing out of his passenger window. Bedoya was shocked and confused by his partner's behavior, but he just drove on. A short time later he heard more shots. Koch was shooting out of the window again. This time Bedoya reached over, hit Koch, grabbed the gun, and brought it inside the car. Bedoya got the gun away from Koch and threw it on the floor. Then Bedoya drove off again.

Koch passed out for a while, but when he woke up he was very belligerent, hollering about his past wives. Bedoya couldn't explain why, but he ended up back at the Dynasty Lounge.

Bedoya and Koch went inside the Dynasty Lounge for the second time that night. Bedoya said that Koch ordered more drinks, but he did not remember if he drank anything while he was there. Bedoya was talking with some friends when he noticed Koch get up and leave the bar. Bedoya started to follow him outside when he was grabbed from behind by someone who said, "Police shit."

Bedoya said that the person who grabbed him tried to go after the weapon in his side holster. They began to struggle. Bedoya said that the man, whom he later learned was Rodriguez, kicked Bedoya in the groin. Bedoya fell down. They continued to struggle over the weapon. Rodriguez was trying to pull the gun out, Bedoya was trying to keep it in the holster.

At some point, Rodriguez succeeded in getting the gun out of the holster. Bedoya said Rodriguez was trying to aim the gun at him and he was trying to push the gun away. In the struggle, the gun discharged.

After the gun discharged, Bedoya was able to regain control of the weapon. Rodriguez simply walked back to the bar, opened the door, and went inside. Bedoya said that he did not know that Rodriguez had been shot.

Bedoya looked around for Koch to see if he was all right. He found Koch and said, "Let's get out of here." Bedoya made a quick stop at the Casanova bar, but then left to go back to Milwaukee.

On the way to Milwaukee, he was stopped by a Highland Park police officer. The officer gave him a field sobriety test, which he passed. At the officer's suggestion, he went to Denny's and parked in the back of the parking lot, near a car dealership. There he rested for a couple of hours before returning to Milwaukee. Upon returning to Milwaukee, he and Koch were arrested in the parking lot of Koch's condo.

After being instructed and hearing argument, the jury returned a verdict finding Bedoya guilty of murder, but not guilty of any of the aggravated discharge of a firearm charges.

## DECISION

The first and controlling issue is whether Bedoya should be granted a new trial because he was not allowed to introduce evidence of the victim's past acts of violence. This type of evidence is referred to as *Lynch* material because in *People v. Lynch*, 104 Ill. 2d 194, 200, 470 N.E.2d 1018 (1984), the court ruled that "when the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence, regardless of when he learned of it."

At the close of Beatriz Rodriguez's testimony at trial, Bedoya's counsel asked for a side bar. Counsel indicated that the theory of self-defense would be raised and he made an offer of proof: if he were allowed to inquire of Beatriz, she would say that in May 1992 Rodriguez beat her while they were living in Cicero. Counsel indicated that this testimony would be relevant as "*Lynch* material."

The court ruled as follows:

"No, counsel. I've already made my rulings. We don't need to have a side bar for every witness if there's some possible Lynch material. And I cannot stand to be interrupted because I let everybody talk. I don't want to have any more sidebars like this. This is—there is no reason for this."

Trial continued and defense counsel did not raise the *Lynch* matter again until the defense was presenting its case. Defense counsel asked for a ruling on whether he would be allowed to present *Lynch* material. The court asked that case law be presented the following day regarding the admissibility of this type of evidence.

The next day the trial court asked defense counsel to set out exactly what evidence he intended to present, how self-defense had been shown, and why the *Lynch* material should be admitted.

Defense counsel explained that he intended to show that on May 21, 1992, Cicero police officers responded to a domestic violence call. Beatriz Rodriguez met the officers outside the home and told the officers that her husband, Jose Julian Rodriguez, punched her in the head and shoved her across the room. Beatriz was eight months pregnant at the time.

Two Cicero police officers approached the Rodriguez home and were confronted by a very irate Rodriguez, who pointed a gun at them and told them to "get the fuck off my property or I'll kill you." Other officers responded and Rodriguez repeatedly threatened to kill the officers and pointed the gun at them. The officers fired a shot at Rodriguez and he eventually was apprehended. Before being placed in handcuffs, Rodriguez resisted arrest by punching, shoving, and kicking the police officers. He later was convicted on three counts of aggravated battery.

Defense counsel said it was his intention to call the four Cicero police officers involved in this altercation with Rodriguez. He also would call Beatriz Rodriguez.

Counsel argued that the evidence was admissible because it was relevant on the issue of who was the aggressor. He further stated that the instruction on self-defense would be offered because the evidence showed that the shooting occurred during a fight in which Bedoya was defending himself.

The State argued against the admission of the evidence, saying that self-defense was not raised in the "traditional manner" since Bedoya was arguing both accident and self-defense. The State's position was that the *Lynch* evidence was not relevant to the case, whether or not the trial court instructed the jury on self-defense.

The trial court sustained the State's objection, ruling that because Bedoya testified the gun went off accidentally, "all questions of self-defense are out of the case ***. You do not have the right to bring in the victim's propensity to commit violent acts if your defense is not that you used deadly force in defense of yourself or that the gun went off accidentally."

■ The resolution of this issue hinges on an understanding of *Lynch*. In *Lynch*, the defendant was charged with murder and raised the defense of self-defense. A jury found the defendant guilty of voluntary manslaughter. Our supreme court decided it was reversible error for the trial court to exclude evidence that the victim had three convictions for battery.

The court said:

> "The convictions were important to the defendant's case, however. They might have affected the jury's judgment of how credible the various versions of the facts were, and they would have helped to complete the picture provided by the testimony. This could have affected the decision as to whether the defendant acted reasonably under the circumstances." 104 Ill. 2d at 199.

The court then went on to say that a defense of self-defense can be supported by evidence of the victim's aggressive and violent character under two separate sets of circumstances: (1) where the defendant claims that his own knowledge of the victim's violent tendencies affected his perceptions and reactions to the victim's behavior, and (2) to support the defendant's version of the facts when there are conflicting accounts of what happened. *Lynch*, 104 Ill. 2d at 199-200. In the second situation, which applies here, it does not matter that the defendant had no prior knowledge of the victim's violent tendencies. The victim's character is circumstantial evidence, which may provide the jury with additional facts to help decide what really happened. *Lynch*, 104 Ill. 2d at 200.

■ On appeal, the State contends this is not a self-defense case, that the trial judge never should have instructed on self-defense. The State now says to make this a self-defense case Bedoya would have to admit he pulled the trigger.

The State's objection to the self-defense instruction is late. It made no objection at the instructions conference. Despite earlier misgivings, the trial judge agreed to instruct the jury on self-defense. And she did.

Besides, the State is wrong on the law. The trial judge correctly instructed the jury on the issue of self-defense. This was not a pure accident case. Slight evidence of self-defense will justify an instruction on the issue. *People v. Lockett*, 82 Ill. 2d 546, 413 N.E.2d 378 (1980).

According to Bedoya, the fight began when Rodriguez grabbed him from behind, saying "Police shit." Bedoya said Rodriguez kicked him in the groin, knocking him to the ground. Then the struggle for Bedoya's holstered gun took place. It was Rodriguez, said the defendant, who pulled the gun out of the holster.

Bedoya's claim that the gun fired accidentally during the struggle does not eliminate self-defense. The firing of the gun might have been an unintended act, but, according to Bedoya, it happened during a life and death struggle. Where there is evidence of self-defense in addition to evidence of accident, the defendant has the right to rely "on an accident theory as to the ultimate injury *and* a self-defense theory as to his preceding acts." (Emphasis in original.) *People v. Robinson*, 163 Ill. App. 3d 754, 768, 516 N.E.2d 1292 (1987). Also see *People v. Stewart*, 143 Ill. App. 3d 933, 494 N.E.2d 1171 (1986).

*Robinson* sets out two lines of cases—one where courts correctly refused to instruct on self-defense, another where the instruction should have been given. The defining and distinguishing factor has to do with the presence of facts that support the defendant's claim he was in a struggle not of his own making.

In *Robinson*, the defendant had testified he became frightened by the victim's yelling at him, that he then grabbed for a shotgun to defend himself, then he struggled over it with the companion of the victim who had produced it, then the shotgun fell and accidentally discharged, killing the victim. Those facts supported the giving of a self-defense instruction. Here, the case is more compelling where, according to the defendant, Rodriguez was trying to aim the gun at him when it went off.

The supreme court cited *Robinson* with approval in *People v. Everette*, 141 Ill. 2d 147, 154, 565 N.E.2d 1295 (1990):

"[T]he *Robinson* court correctly observed that those decisions which refused to instruct the jury as to self-defense did so because there was insufficient evidence in the record to support the instruction and not because there was an inherent or definitional contradiction in the defenses."

In *Everette*, the supreme court said:

"We, therefore, hold that a homicide defendant is entitled to an instruction on self-defense where there is some evidence in the record which, if believed by a jury, would support the defense, even where the defendant testifies he accidentally killed the victim." *Everette*, 141 Ill. 2d at 156-57.

The decisions relied on by the State, particularly *People v. Armstrong*, 273 Ill. App. 3d 531, 653 N.E.2d 17 (1995), did not contain factual conflicts concerning who was the aggressor in the struggle. For that reason, those decisions do not apply to this case.

Here, Bedoya claimed throughout the trial that Rodriguez was the aggressor in their confrontation. No witness, other than the defendant, saw how it began. The jury had to determine whether Bedoya's account of the events that led to the shooting was believable.

Koch testified that Rodriguez was already fighting with Bedoya when he left the bar. He tried to intervene in the fight but did not even see a gun or who was holding it when it fired.

The Dynasty bartender, Lopez, testified that he, too, did not see the initial encounter between Rodriguez and Bedoya. However, when he went outside and saw them fighting, he saw the gun in Bedoya's hand and Rodriguez trying to push it away.

The evidence regarding who was the initial aggressor was both "incomplete and conflicting." See *Lynch*, 104 Ill. 2d at 200. The evidence concerning Rodriguez's prior acts of aggravated battery, especially because they involved police officers, was clearly relevant to the issue of who was the first aggressor in this instance. If the jury believed Rodriguez was the first aggressor, it would be more likely to believe the gun went off as Bedoya was defending himself, as he claimed in his testimony.

The fact that Bedoya was a police officer and Rodriguez apparently knew this may have caused jurors to think it less likely that Rodriguez would attack a police officer or try to grab for his gun. The fact that two years earlier Rodriguez, when confronted by four police officers, had threatened them with a gun and, when apprehended, resisted arrest and kicked the officers, would have gone a long way to dispel any misconception that Rodriguez would have been reluctant to attack a police officer.

It is clear, then, that the trial court was incorrect when it said

that defendant could not advance the theory of both self-defense and accident.

By refusing to admit evidence of the victim's past acts of violence, the trial court deprived the jury of evidence that would have assisted it in resolving the question of who was the initial aggressor and in assessing Bedoya's testimony that the gun fired accidentally during the confrontation between him and Rodriguez. Bedoya's defense was that he acted reasonably. See *People v. McGee*, 213 Ill. App. 3d 458, 572 N.E.2d 1046 (1991). Whether Rodriguez was a violent person was an important and relevant part of the defense.

For the reasons stated above, Bedoya's conviction is reversed and the matter remanded for a new trial.

Since Bedoya was acquitted of the aggravated discharge of a firearm charges and cannot be retried on them, Bedoya's new trial will be on the charge of murder only. It is unnecessary, and we decline to consider, whether Bedoya was prejudiced by the trial court's refusal to sever these charges from the murder charge and have separate trials.

## CONCLUSION

Because the evidence was adequate to support a guilty verdict, the error we have found requires that the defendant's murder conviction be reversed and the cause remanded for a new trial.

Reversed and remanded.

CERDA and BURKE, JJ., concur.