2021 IL App (1st) 160800-U

SIXTH DIVISION
December 23, 2021

No. 1-16-0800

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 14 CR 227501 |
| | ) | |
| | ) | |
| TIMOTHY BARBER, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE PIERCE delivered the judgment of the court.
Justices Harris and Mikva concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant is guilty of second degree murder.  Trial counsel was not ineffective.  Defendant's sentence is not excessive.  Under Rule 472, we remand for defendant to move for credit against his sentence.

¶ 2    Following a bench trial, defendant, Timothy Barber, was convicted of second degree murder and was sentenced to a term of 27 years' imprisonment.  Defendant now appeals and argues: 1) the State failed to prove him guilty of second degree murder beyond a reasonable doubt; 2) trial counsel was ineffective; 3) his sentence is excessive; and 4) there are errors in the

court's fines, fees and costs order that need to be corrected. For the following reasons, we affirm defendant's conviction but remand the cause for defendant to move for credit against his sentence.

¶ 3                                    BACKGROUND

¶ 4     Defendant was tried in a joint bench trial with his son and co-defendant Jason Smith for the murder of Lamont Larkins. Defendant asserted during trial that he acted in self-defense and defense of others and that he and Smith were authorized to use lethal force because of the amount of force used by Larkins.

¶ 5     Prior to trial, the State made an oral motion *in limine* seeking to bar the introduction of evidence that the victim had previously been arrested for domestic battery, criminal damage to property, robbery and unlawful restraint. The court held that the victim's conviction for robbery was admissible pursuant to *People v. Lynch*, 102 Ill. 2d 194 (1984), but that his other arrests were inadmissible.

¶ 6     On August 29, 2013, Gregory Benson and Lamont Larkins went to the home of Dorothy Brown, where they played cards against Brown's nephew, defendant, and defendant's son, Jason Smith, at a table set up outside. Several others came into the yard to socialize, including Brown's daughter, Tara Barber, Tara's boyfriend, Taurean Holmes, Tara's friend, Katrina Baker, and Baker's boyfriend, Arthur Terry.

¶ 7     Brown testified that she went to bed while people were still in her yard. Sometime thereafter, her daughter Tara woke her and told her that people were fighting. Brown went into the backyard and saw Larkins, whom she did not know previously, lying on the ground. Her great-nephew, Jason Smith, was holding a shirt to Larkin's body. Larkins would not lie still so

2

Smith eventually walked away from him. Someone called 911 and when the ambulance arrived, Brown spoke with emergency personnel. Larkins was taken away.

¶ 8 Brown went inside and asked Smith what happened. Smith told her that Larkins accused him of cheating during a card game and grabbed Smith's money. Smith told her that the two started fighting after Larkins "muffed" him, and then Smith "stuck" Larkins twice. Brown testified that "to stick" someone meant to hit him with an object in your hand, and not just with a fist.

¶ 9 Gregory Benson testified that he was friends with Larkins and went with him to play cards at Brown's house on the night of the incident. Larkins was already drunk when Benson met up with him. The men played spades. Benson was Larkins's partner and defendant was Smith's partner. Benson did not drink any alcohol but the other three men were drinking. Benson testified that defendant flicked a box cutter repeatedly during the card game. Benson estimated the length of the box cutter at one and a half inches when closed and perhaps three inches when opened.

¶ 10 Larkins accused Smith of cheating two times during the game. Both times, Smith told Larkins he could have the pot. When Smith needed change for a $10 bill, he went into the house and came back out a few minutes later without change. Larkins took the $10 bill from Smith's hand and said, "this my money, do something 'bout it now." Larkins then punched Smith in the face. Smith did not fight back. Larkins struck Smith again and Smith started to fight back. When Larkins continued hitting Smith even after Larkins appeared to have gotten the best of the fight, defendant jumped in, slashing Larkins with the box cutter. Larkins was cut on his arm, under his eye and on his back and chest. Benson saw no other weapon.

¶ 11    Defendant and Smith then pushed Benson and Larkins out of the backyard, toward the alley and told them they had to leave. Smith's female relative came outside to see what was going on. Benson called the police. Defendant left, walking down the alley. Smith was also in the alley but left as Benson was calling the police.

¶ 12    Benson spoke to the police but did not tell them what he saw because Smith's and defendant's families were watching him. He told police that he was called to the backyard after Larkins was stabbed. Benson spoke with the police again on September 3, and relayed what really happened when Larkins was stabbed. Benson identified defendant and Smith from two separate photo arrays and later identified defendant as the person who slashed Larkins in a lineup.

¶ 13    Arthur Terry testified that he saw a friendly card game, and then he heard Larkins and Smith arguing about money. Larkins, Benson and Smith were drinking alcohol. Terry was not sure if defendant was drinking. Larkins grabbed cash from Smith's hand, knocked over the table, and hit Smith in the face. Smith told Larkins to leave, but Larkins remained. Smith went inside, and when he came back out a few minutes later the fight resumed.

¶ 14    At some point when Larkins and Smith were on the ground fighting, defendant became involved in the fight. Terry did not see any weapon. Terry tried unsuccessfully to break up the fight. After Larkins and Smith fought for two to three minutes, Terry saw that Larkins was bleeding from his chest. Larkins said, "yall [sic] stabbed me." Terry left the house.

¶ 15    Defense counsel sought to clarify Terry's testimony about when Larkins took cash from Smith's hand. Terry answered, "It was before he even went into the house." But Terry agreed that he told police that "after Jason came back out of the house, [Larkins] grabbed the money

4

from him." On another attempt, counsel asked, "[W]hen Jason went into the house, he came out with a $10 bill, right?" Terry answered, "I wouldn't say yes or no. I am unsure for that one."

¶ 16    Katrina Baker testified that she saw a friendly card game. At some point, Larkins and Smith began arguing about money. Larkins put some money in his pocket. Smith then went into the house. Defendant then went into the house and when he came to the door he began to adjust his clothes as he returned to the yard. When she came out of the house, she saw Smith and Larkins on the ground. She did not see either with a weapon. The fighting stopped at some point and Larkins stood up and said that someone had stabbed him. Baker saw blood on Larkins but did not see any actual wounds. She then left with Terry. She denied seeing Larkins holding a piece of glass in his hand.

¶ 17    Tara Barber testified that the card game was calm until Smith and Larkins started arguing about money. She was inside the house when she heard Larkins say, "squad up," meaning put up your fists and fight. Tara looked out the window and saw Smith and Larkins fighting. Tara woke up Brown and asked her to try to break up the fight while Tara stayed inside with her children.

¶ 18    Taurean Holmes also saw the men playing cards. Larkins became mad because he lost. Holmes went into the house after having words with Larkins. Later, he looked out the window and saw Smith and Larkins having words. Holmes went outside and saw Smith, Larkins and defendant fighting for approximately 15 seconds. All three men were swinging. After they stopped fighting, Larkins said either, "yall [sic] stabbed me," or "you cut me." Holmes went inside and then came out again and saw Larkins in the alley. Larkins had bloody marks on his back and one under his forearm.

5

¶ 19  Dr. Eric Eason, the medical examiner, testified that Larkins was five feet eleven inches tall and weighed 232 pounds. Dr. Eason found several superficial cuts on Larkins's body. A box cutter could have made the cuts but would not have killed Larkins. A cut six inches deep reached Larkins's heart, and that wound killed him. In Dr. Eason's opinion, an instrument like a kitchen knife, at least four inches long inflicted the fatal wound. Larkins' cause of death was a stab wound to his torso, and the manner of death was homicide.

¶ 20  The prosecution presented a video recording of defendant answering questions at the police station. He admitted that he intervened in the fight when he saw his son losing, and he slashed at Larkins with a box cutter.

¶ 21  Chicago police detectives Roger Murphy spoke with defendant on September 29, 2013. Defendant gave a videotaped statement that was played during trial. He initially lied to police about this involvement, but after being confronted with what other witnesses had told the police, defendant admitted that he was playing cards that night when Smith and Larkins started arguing over money and accusing each other of cheating. He saw Smith run inside and someone said that he got a knife. While Smith and Larkins were fighting, defendant stabbed him in the back with a box cutter two or three times. Defendant did not know if Smith stabbed Larkins and he did not see Larkins with a knife. Defendant admitted that he was drunk at the time of the stabbing but stated that he stabbed Larkins because he "had the best" of Smith. He left the scene and threw the knife in the bushes.

¶ 22  Defendant introduced two stipulations into evidence. The parties stipulated that Benson would testify that "other people jumped into the fight the second time once they got back up and got to fight again." The parties further stipulated that Detective Lutzow would testify that he

interviewed Katrina Baker on the day of the murder, and she told him that Larkins put money in his back pockets and said, "that's my money, what you gonna do about it?" Baker also said that she saw a piece of broken glass in Larkins' hand. Detective Lutzow would also testify that when he interviewed Dorothy that night, she did not tell him that Smith said he "stuck him twice."

¶ 23 During closing arguments, defense counsel asserted that defendant was not responsible for Larkins's death because his box cutter could not have caused the fatal injury. Counsel also argued that defendant and Smith were authorized to use lethal force because Larkins was being aggressive and violent and because Larkins committed the forcible felony of robbery when he took money from Smith before punching him.

¶ 24 The trial court found defendant and Smith guilty of second degree murder. The court found that Larkins was the initial aggressor but that neither defendant nor Smith was justified in responding with lethal force. The court stated that "There is no evidence that deadly force was needed to defend this fistfight." The court also rejected defendant's argument that lethal force was authorized because Larkins was committing a forcible felony. The judge said:

"It is a card game. It is a dispute over winnings. *** While it may be antisocial and it may be wrong, at best, at best, it is a theft by person. It is nowhere near a robbery. There was no force used to take that. *** It is not something where a person is being knocked down on the street and your purse is being taken ***.

*** There is no forcible felony."

¶ 25 The court found defendant guilty of second degree murder and sentenced him to 27 years' imprisonment. This appeal followed.

¶ 26                                    ANALYSIS

7

¶ 27    Defendant first argues that the State failed to prove him guilty of second-degree murder beyond a reasonable doubt because the State failed to prove that he stabbed the victim or that he was guilty on an accountability theory.

¶ 28    When reviewing the sufficiency of the evidence in a criminal case, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Smith*, 185 Ill. 2d 532, 541 (1999). We will not reverse a criminal conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Rowell*, 229 Ill. 2d 82, 98 (2008). A reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness' testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). Rather, we "carefully examine the evidence while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses." *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011).

¶ 29    Section 9-2 of the Criminal Code of 1961 (Code) provides that a person commits second degree murder when he commits first degree murder and a mitigating factor is present. 720 ILCS 5/9-2(a)(2) (West 2008). The elements of first and second degree murder are identical, but second degree murder differs from first degree murder only in the presence of a mitigating factor, such as an alleged provocation or an unreasonable belief in justification. *People v. Porter*, 168 Ill.2d 201, 213 (1995). For a defendant to be guilty of second degree murder, the State must first prove the defendant guilty of first degree murder beyond a

8

reasonable doubt. 720 ILCS 5/9-2(c) (West 2014). The burden then shifts to the defendant to prove the existence of the mitigating factor by a preponderance of the evidence. 720 ILCS 5/9-2(c) (West 2014).

¶ 30    "[T]o raise a claim of self-defense, a defendant must present evidence supporting each of the following elements which justify the use of force in defense of a person: (1) that force had been threatened against defendant; (2) that defendant was not the aggressor; (3) that the danger of harm was imminent; (4) that the force threatened was unlawful; (5) that defendant actually believed that a danger existed, that the use of force was necessary to avert the danger, and that the kind and amount of force actually used was necessary; and (6) that defendant's beliefs were reasonable." *People v. Morgan*, 187 Ill. 2d 500, 533 (1999). Once the defendant has made a minimal showing on each of the necessary elements for self-defense, "the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Lee*, 213 Ill. 2d 218, 224 (2004).  The determination of whether a defendant is guilty of first degree murder or guilty of second degree murder is a question for the finder of fact. *People v. Simon*, 2011 IL App (1st) 091197, ¶ 52.

¶ 31    Defendant argues that the State failed to prove him guilty beyond a reasonable doubt as it did not establish that he was the principal where the medical examiner testified that the blade on the box cutter that was in his possession could not have caused the fatal wound because the fatal wound was caused by a long, firm blade that was four to six inches in length. Defendant urges that the evidence establishes that Smith possessed the weapon that caused the fatal wound and argues that Smith had the opportunity to retrieve a knife from the house

9

and told Brown that he stuck Larkins twice during the fight. Defendant also argues that the State also did not establish that he was accountable for Smith's action where there was no agreement between defendant and Smith.

¶ 32 Viewing the evidence in the light most favorable to the State, it is clear that defendant was convicted of Larkins' death on a theory of accountability. To convict a defendant under the theory of accountability, the State must prove beyond a reasonable doubt that he (1) solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the offense; (2) did so before or during the commission of the offense; and (3) did so with the concurrent, specific intent to promote or facilitate the commission of the offense. 720 ILCS 5/5-2(c) (West 2004); *People v. Smith*, 278 Ill. App. 3d 343, 355 (1996). The law on accountability incorporates the "common design rule," which provides that where two or more persons engage in a common criminal design, any acts in furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts. *People v. Cooper*, 194 Ill. 2d 419, 434-35 (2000).

¶ 33 Accountability may be established through a person's knowledge of and participation in the criminal scheme, even though there is no evidence that he directly participated in the criminal act itself." *In re W.C.*, 167 Ill.2d 307, 338 (1995). "Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." *Cooper*, 194 Ill. 2d at 435. Nevertheless, "mere presence

10

at the scene, even with knowledge that the crime is being committed, is insufficient to establish accountability for the actions of another." *W.C.*, 167 Ill. 2d at 338.

¶ 34    The evidence in this case showed that defendant inserted himself into an ongoing physical fight between Smith and Larkins.  Smith did not leave the fight after defendant joined in.  Rather, Smith continued fighting Larkins for two or three more minutes.  Both defendant and Smith were hitting Larkins. Benson saw Barber slashing Larkins and Barber admitted slashing Larkins with his box cutter during the fight. The fight continued until Larkins stated that he had been stabbed.  A rational trier of fact could have found that defendant and Smith shared the same design in fighting the victim, namely, to cause him great bodily harm.

¶ 35    The evidence further established that during the course of the fight, one or both of defendant and Smith stabbed the victim.  The evidence showed that defendant confessed that he was in possession of a weapon that was similar to a box cutter but was "like a flip pocketknife that had a razor like at the tip of it," and he admitted joining the fight and slashing Larkins with the box cutter. Defendant also admitted he heard someone say Smith had a knife. Gregory testified that Larkins claimed he had been stabbed during the fight with defendant and Smith and had numerous wounds on his body.  Dr. Eason testified that not all of those wounds were equal, and some were superficial, consistent with the use of a box cutter.  The fatal wound, however, was of a significantly different size and shape and appeared to be caused by a different weapon.  The fatal wound went six inches into Larkins and pierced his heart, which would have required the use of a long blade.  Dr. Eason opined that the fatal wound was likely caused by a common kitchen knife, not a box cutter. Dr. Eason further opined that a box cutter was capable of causing the superficial wounds to Larkins' body. There

11

was evidence presented that Smith had both the opportunity to obtain a knife when he went inside the house and the motive to arm himself after Larkins took his money and punched him in the face. Based on this evidence, a rational trier of fact could have drawn the reasonable inference that defendant and Smith acted in concert, and under an accountability theory the evidence was sufficient to prove Barber guilty of second degree murder beyond a reasonable doubt.

¶ 36    In *Cooper*, our supreme court specifically found that "a defendant may be found guilty under an accountability theory even though the identity of the principal is unknown." *Cooper*, 194 Ill. 2d at 435. In that case, two defendants were found guilty under an accountability theory for aggravated battery with a firearm, even though it was unclear which of the defendants shot the victim. Our supreme court affirmed their convictions because the defendants were working in concert as part of a common design. The failure to identify the shooter did not preclude a finding of guilt under the common design theory of accountability. *Id*. at 436.

¶ 37    Similarly, in *People v. Cooks*, 253 Ill. App. 3d 184 (1993), this court affirmed a defendant's conviction for murder under an accountability theory, even though the actual shooter was never identified. In that case, the defendant and several of his fellow gang members pursued rival gang members after a fight. Eventually, the rival gang members were trapped in the vestibule of a tavern. Defendant fired into the vestibule and struck one victim in the leg. Defendant also shot another victim in the head and killed him. During the shooting, "[a]n 'arm' holding a shotgun" fired into the vestibule and shot the first victim in the stomach, killing him. *Id*. at 189.

12

¶ 38    The *Cooks* court found that the evidence sufficiently established that the defendant shared a common design with the co-offender as the defendant facilitated the plan to harm rival gang members. The defendant also aided the unidentified shooter by first shooting the victim in the leg and making him more vulnerable to the subsequent shot. The court further noted that the shots were fired as part of a joint action and the defendant did not attempt to intervene or voice opposition to the actions of the co-offender. *Id.* at 189-90.

¶ 39    Based on the evidence presented, a rational trier of fact could have found defendant guilty of Larkins' murder under an accountability theory where he shared a common design in fighting Larkins and causing great bodily harm to Larkins in slashing him with box cutter and then fleeing the scene after observing the injury inflicted on the victim.  It was for the trial court to determine the credibility of the witnesses and the weight to be afforded their testimony. See *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). Here, the court found the evidence was sufficient to sustain defendant's conviction for second-degree murder on a theory of accountability and this finding is not so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of defendant's guilt.

¶ 40    We likewise reject defendant's argument that even if defendant did cause the fatal wound or was accountable for Smith's actions, both defendants had lawful authority to use lethal force because Smith was being robbed by an aggressive, intoxicated Larkins.

¶ 41    There was no credible evidence that Larkins was armed during the fight with Smith. While it is not necessary that the aggressor be armed for a defendant to succeed on a self-defense theory, it still must "appear that the aggressor is capable of inflicting serious bodily harm without the use of a deadly weapon, and is intending to do so." *People v. Hawkins*, 296

13

Ill. App. 3d 830, 837 (1998). There simply was no evidence presented to suggest that Larkins was capable of inflicting serious bodily harm on either defendant or Smith.

¶ 42    The evidence merely established that Larkins was drunk and aggressive. There was nothing from the testimony regarding Larkins's physical size that would have led defendant to believe that he needed to get involved in order to prevent Smith's death or great bodily harm. Defendant admitted that he was drunk and joined the fight because Larkins was getting the best of Smith. Defendant admitted to using a box cutter to repeatedly stab or slash the victim. Defendant did not claim that he did so because he believed his actions were necessary to prevent imminent death or great bodily harm to himself or Smith. There were two people fighting Larkins, and one of those persons, defendant, was admittedly armed with and used a box cutter, and the other was armed with a knife while the victim was not.

¶ 43    Defendant also argues that his use of force was justified because Larkins was in the process of committing a robbery. To justify the use of deadly force, the defense presented evidence that Larkins committed robbery, a forcible felony (720 ILCS 5/2-8 (West 2012)). A person commits robbery "when he or she knowingly takes property from the person or presence of another by the use of force or by threatening the imminent use of force." 720 ILCS 5/18-1 (West 2014).

¶ 44    Viewing the evidence in the light most favorable to the State we must reject this argument. There was conflicting testimony from occurrence witnesses about whether Larkins took the money from Smith before or after Smith went into the house and corresponding conflicting testimony about whether the fist fight began before or after Smith went into the house. When defendant was specifically asked why he got involved in the fight, he explained

14

that he did so because he was drunk and Larkins was fighting with Smith. Defendant explained that he heard Larkins and Smith arguing over money and accused each other of cheating. Defendant never stated that he saw Larkins grab money from Smith. There is simply no evidence to support defendant's theory that he interceded in the fight because he was trying to stop or prevent the commission of a robbery.

¶ 45    Defendant next argues that he was denied a fair trial when the trial court excluded certain *Lynch* evidence regarding Larkin's prior violent behavior. Specifically, defendant argues that the trial court should have allowed evidence of Larkin's two prior domestic violence incidents, as well as a criminal damage to property.

¶ 46    In *Lynch*, our supreme court held that when a defendant raises self-defense as a theory in his case, evidence showing the victim's aggressive and violent character is relevant to show: (1) the defendant's knowledge of the victim's violent tendencies affected his perceptions of and reactions to the victim's behavior; or (2) to support the defendant's version of the facts when there are conflicting versions of events. *Id*. at 200. In the second situation, the victim's character is circumstantial evidence which may provide the trier of fact with additional facts to help decide what really happened. *People v. Bedoya*, 288 Ill. App. 3d 226, 236 (1997).

¶ 47    The question of whether defendant could present evidence of Larkin's prior aggressive and violent behavior under *Lynch* was litigated extensively. In a pretrial motion, defense counsel indicated that defendant would raise a claim of self-defense at trial. Counsel moved to admit three instances of Larkin's prior violent conduct: one incident of domestic battery to Larkins' girlfriend where he attacked her, threw her against a wall and choked her, one incident of criminal damage to property of Larkin's girlfriend's car, and one incident of robbery where

15

defendant was involved in a robbery of an individual in a currency exchange. Larkins was convicted of both the domestic battery and the robbery but the criminal damage to property was dismissed after the victim failed to appear in court. The State made an oral motion *in limine*, asking the court to bar admission of this evidence.

¶ 48 Defendant claims that Larkins's prior arrest for criminal damage to property and conviction for domestic battery were relevant under the second reason given in *Lynch*, *i.e.,* to support defendant's version of the events immediately preceding Larkins' death when there were conflicting accounts of what occurred. However, there was no dispute in this case that Larkins was the initial aggressor. The court found stated, "there is no doubt in my mind that the victim was the initial aggressor." The only conflicting evidence was in regard to whether the fight began before Smith went into the house or after.

¶ 49 We cannot say that the trial court abused its discretion when it did not allow the domestic battery or criminal damage to property incident to serve as *Lynch* evidence. The court held that Larkin's conviction for robbery was admissible *Lynch* evidence but did not allow his other arrests and convictions for domestic violence and criminal damage to property to be admitted. With respect to their exclusion the court stated, "I believe these are dissimilar with regard to motivation here. I don't believe it goes to who the initial aggressor is with a domestic battery. This is allegedly some type of dispute over a dice game, and I don't think that those domestic battery incidents have any probative value as to who might have been the initial aggressor in this matter." We agree that Larkins' prior convictions were irrelevant to establish Larkins' prior violent and aggressive behavior here where there was no dispute that Larkins was the initial aggressor.

16

¶ 50    We likewise find that defense counsel was not ineffective for failing to introduce evidence of Larkins' robbery conviction to establish his aggressive and violent character. Although the court ruled it admissible under Lynch, defense counsel did not present any evidence of Larkins' prior conviction for robbery.

¶ 51    To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was deficient and (2) counsel's actions resulted in prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Evans,* 209 Ill. 2d 194, 220 (2004). Under the first prong, a defendant must demonstrate that his attorney's performance fell below an objective standard of reasonableness. *Evans*, 209 Ill. 2d at 220. Under the second prong, prejudice is shown where there is a reasonable probability that the result would have been different but for counsel's alleged deficiency. *Id.* Failure to satisfy either prong of the Strickland test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697.

¶ 52    The record, in our view, supports the finding that defense counsel's failure to introduce evidence of Larkins' prior robbery conviction to establish his violent and aggressive character was a valid trial strategy and not unreasonable. See *People v. Orange*, 168 Ill. 2d 138, 153 (1995) (noting that a decision which involves a matter of trial strategy will generally not support a claim of ineffective representation). There was no issue in this case as to who the initial aggressor was. It was clearly Larkins. Therefore, the admission of *Lynch* evidence could not be properly introduced. Defendant suffered no prejudice as a result of counsel's failure to introduce this evidence.

¶ 53    Defendant next argues that his 27-year sentence is excessive where it is grossly disparate to the 12-year sentence that co-defendant Smith received. Defendant claims that the disparity in

17

the sentences was not warranted where he was not the principal and that his background does not merit the disparity.  Defendant also argues that the trial court erred  in failing to consider certain mitigating factors in imposing the sentence and improperly considered a factor inherent in the offense.

¶ 54    A trial court has broad discretionary powers in choosing the appropriate sentence a defendant should receive. *People v. Jones*, 168 Ill. 2d 367, 373 (1995).  A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case and depends upon many factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age.  *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977).   "In determining an appropriate sentence, the defendant's history, character, rehabilitative potential, the seriousness of the offense, the need to protect society and the need for deterrence and punishment must be equally weighed."  *People v. Jones*, 295 Ill. App. 3d 444, 455 (1998).  The potential for rehabilitation need not be given any greater weight than the seriousness of the offense.  *People v. Sharpe*, 216 Ill. 2d 481, 525 (2005).  There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, and the court is presumed to have considered any evidence in mitigation that is before it.  *People v. Partin*, 156 Ill. App. 3d 365, 373 (1987).  The imposition of a sentence is a matter within the trial court's discretion, and a reviewing court has the power to disturb the sentence only if the trial court abused its discretion.  *Jones*, 168 Ill. 2d at 373-74.

¶ 55    Defendant was convicted of second degree murder, a Class 1 offense.  720 ILCS 5/9-2(d) (West 2012).  Based on defendant's criminal history, the trial court was required to sentence him as a Class X offender, which carries a punishment of six to thirty years' imprisonment.  730

18

ILCS 5/5-4.5-25 (West 2012). The 27-year sentence imposed was well within the prescribed statutory range. We cannot say that the trial court abused its discretion here in imposing a 27-year sentence in this case, a sentence that was well within statutory guidelines and therefore presumptively proper. *People v. Gutierrez*, 402 Ill. App. 3d 866, 900 (2000).

¶ 56 We also reject defendant's argument that the court failed to consider his rehabilitative potential. Before imposing its sentence, the trial court was in possession of the presentence investigation report and heard arguments in aggravation and mitigation. See 730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2012). In aggravation, the court heard that defendant had three prior felony convictions. Defendant committed the offense of first degree murder in 1989 and served a 20-year sentence. In 2004, defendant was convicted of delivery of a controlled substance and was sentenced to 6 years' imprisonment. In 2007, he was convicted of aggravated driving while under the influence and was sentenced to one year in prison. In mitigation, the court heard that defendant worked at Popeye's from 2009 until the time of his incarceration in this case and was named employee of the year in 2010, 2012 and 2013. The court also heard from his co-worker and girlfriend, and four of her children, who wrote letters to the court stating how helpful and responsible defendant was. In addition, defense counsel informed the court that defendant had a substance abuse problem. Nevertheless, the court chose to impose a 27-year sentence and stated, referencing his prior murder conviction, "at no point in time can I in good conscience say his criminal conduct will not reoccur."

¶ 57 Defendant also argues that the trial court improperly considered that defendant's conduct caused serious harm as an aggravating factor, where serious harm was an element of the offense charged. Specifically, defendant complains that the trial court remarked, "And I look at the matter

19

in aggravation; of course I consider all 14 matters in mitigation, also statutory factors in mitigation with regard to aggravation. Obviously, his conduct causes or threatened serious harm, he has a history of prior criminal activity, that this sentence is necessary to deter others from committing a crime." Defendant claims that his infliction of serious harm cannot be considered as both an element of the offense of second degree murder and as a factor in aggravation.

¶ 58 The trial court is not permitted impose a more severe sentence on the ground that defendant caused the victim serious bodily harm, namely, death, because death is inherent in the offense of second degree murder. *People v. Saldivar*, 113 Ill. 2d 256, 271-72 (1986). A court may consider in aggravation the fact that "defendant's conduct caused or threatened serious harm." 730 ILCS 5/5-5-3.2(a)(1) (West 2008). In applying this aggravating factor, the trial court may consider the force employed and the physical manner in which the victim's death was brought about, which comprehends the degree or gravity of defendant's conduct rather than the end result, that is, the death of the victim. *Saldivar*, 113 Ill. 2d at 271-72.

¶ 59 In *People v. Beals*, 162 Ill. 2d 497 (1994), the trial court stated the following during the defendant's sentencing hearing: " 'In aggravation the first guideline indicated in the statute is "whether the conduct of the defendant caused or threatened serious harm." Well, we all know that your conduct caused the ultimate harm. It caused the loss of a human life.' " *Id*. Our supreme court determined that listing factors during sentencing does not necessarily mean that the trial court relied on all of those factors in determining the appropriate sentence reasoning that,

"The trial court never indicated, however, that it 'considered' the victim's death as an aggravating factor justifying an extended-term sentence. Rather, the record suggests that the trial court statement was simply a general passing comment based upon the

20

consequences of the defendant's actions.

Even assuming arguendo that the trial court's comment may be construed in the manner that the defendant suggests, we nevertheless conclude that the defendant's sentence should be affirmed. A trial court's reliance upon an improper factor does not always necessitate remandment for resentencing. [Citation.] A cause must be remanded for resentencing only where the reviewing court is unable to determine the weight given to an improperly considered factor. [Citation.] Where it can be determined from the record that the weight placed upon the improperly considered aggravating factor was insignificant and that it did not lead to a greater sentence, remandment is not required. [Citation.]" *Id*. at 509-10.

¶ 58 In this case, it is evident from the record that the trial court placed little, if any, weight upon the fact that defendant's conduct caused the ultimate harm. Although the trial court observed that defendant's conduct caused or threatened serious harm, the record clearly reveals that the court based its sentencing decision after considering "all of the matters of aggravation and mitigation." The trial court noted defendant's age, the facts of the case, the presentence investigation report, the victim impact statement, and the letters submitted on defendant's behalf. The court also noted defendant's behavior of entering a fist fight with a box cutter, his "callous disregard" of the victim when he pushed Larkins into the alley after the stabbing. The court further noted that defendant was "no stranger to the criminal justice system," but that he had "apparently stayed clean for a couple years." The court's fleeting mention of defendant generally causing or threatening harm was insignificant and in accordance with *Beale*, remandment on this issue is unnecessary.

¶ 59 Defendant asserts that the trial court failed to consider the financial impact of incarcerating

21

him in the Illinois Department of Corrections for 27 years. See 730 ILCS 5/5-4-1(a)(3) (West 2014) (sentencing court "shall" "consider the financial impact of incarceration based on the financial impact statement filed with the clerk of the court"). But a trial court is not required to specify on the record the reasons for a defendant's sentence, and absent evidence to the contrary, the trial court is presumed to have performed its obligations and considered the financial impact statement before sentencing a defendant. *People v. Canizalez-Cardena*, 2012 IL App (4th) 110720, ¶ 24. Here, there is nothing in the record to rebut the presumption that the trial court considered the financial impact of defendant's imprisonment before sentencing him. Therefore, given that there is no evidence that the trial court acted outside his authority, we presume the court acted in accordance with the law when it sentenced him to 27 years in prison.

¶ 60　　Last, defendant argues that six assessments classified as fees are actually fines and must be offset by his $5 per day presentence incarceration credit. Defendant contends that the trial court ordered him to pay $379 in fines, fees and costs but he has 881 days of presentence custody credit that should be applied. Defendant concedes that he did not challenge these assessments in the trial court.

¶ 61　　This issue governed by Illinois Supreme Court Rule 472 (eff. Mar. 1, 2019), which was adopted after defendant filed his brief. Rule 472 sets forth the procedure in criminal cases for correcting certain sentencing errors, including "[e]rrors in the imposition or calculation of fines, fees, and assessments or costs," "[e]rrors in the application of per diem credit against fines," "[e]rrors in the calculation of presentence custody credit," and "[c]lerical errors in the written sentencing order." Ill. S. Ct. R. 472(a) (eff. Mar. 1, 2019). The rule provides that, in criminal cases, "the circuit court retains jurisdiction to correct" the enumerated errors "at any time following

22

judgment ***, including during the pendency of an appeal." Ill. S. Ct. R. 472(a) (eff. Mar. 1, 2019). Additionally, "[n]o appeal may be taken" on the ground of any of the sentencing errors enumerated in the rule "unless such alleged error has first been raised in the circuit court." Ill. S. Ct. R. 472(c) (eff. Mar. 1, 2019).

¶ 62     More recently, our supreme court amended Rule 472 by adding paragraph (e) (Ill. S. Ct. R. 472(e) (eff. May 17, 2019)), which provides: "In all criminal cases pending on appeal as of March 1, 2019, or appeals filed thereafter in which a party has attempted to raise sentencing errors covered by this rule for the first time on appeal, the reviewing court shall remand to the circuit court to allow the party to file a motion pursuant to this rule."

¶ 63     Defendant's appeal falls within the scope of Rule 472. Thus, pursuant to the provisions of Rule 472, we remand to allow defendant the opportunity to file a motion to correct any sentencing errors.

¶ 64                                CONCLUSION

¶ 65     In light of the foregoing, we affirm defendant's conviction but remand to the trial court to allow defendant the opportunity to file a motion to correct any errors related to fines, fees or assessments or credits he may be entitled to.

¶ 66     Affirmed; remanded for consideration of defendant's fines and fees claim.