NOTICE

Decision filed 08/04/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230527-U

NO. 5-23-0527

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 21-CF-242 |
| | ) | |
| JAQUEZ R. GARDNER, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Welch* and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction for first degree murder, where defendant failed to prove by a preponderance of the evidence that a mitigating factor existed to reduce his conviction to second degree murder; the trial court did not deprive defendant of his constitutional right to a public trial; defense counsel did not render ineffective assistance of counsel; the State's conduct did not constitute prosecutorial misconduct; and defendant's 80-year sentence was not excessive.

¶ 2    Following a jury trial in the circuit court of Jefferson County, defendant, Jaquez R. Gardner, was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2020)), aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)), and armed habitual criminal (*id.* § 24-1.7(a)) and

_____

*Prior to his death, Justice Welch fully participated in the decision of the court. *Cirro Wrecking Co. v. Roppolo*, 153 Ill. 2d 6, 17-19 (1992) (holding that departure of appellate judge prior to the date the clerk of the court enters disposition does not affect the disposition's validity where three judges participated in the decision and remaining two judges agree on disposition).

1

sentenced to 80 years in prison followed by 6 years of mandatory supervised release (MSR). Defendant appeals, arguing that this court should reduce his conviction to second degree murder, the trial court denied defendant his constitutional right to a public trial, defense counsel rendered ineffective assistance of counsel, prosecutorial misconduct deprived defendant of a fair trial, and his sentence was excessive. For the following reasons, we affirm.

¶ 3                                    I. Background

¶ 4      We limit our recitation to those facts relevant to our disposition of this appeal. We will recite additional facts in the analysis section as needed to address defendant's specific arguments.

¶ 5      On July 7, 2021, the State charged defendant by information with three counts of first degree murder, alleging that defendant, without lawful justification and with the intent to kill the victim, Jamarco Foulks, (count I) (*id.* § 9-1(a)(1)), shot Jamarco with a firearm knowing said act would cause the death of Jamarco (count II) (*id.* § 9-1(a)(1)) and created a strong probability of death to Jamarco (count III) (*id.* § 9-1(a)(2)), thereby causing his death. The State also charged defendant with aggravated discharge of a firearm (count IV) (*id.* § 24-1.2(a)(2)), a Class 1 felony, and armed habitual criminal (count V) (*id.* § 24-1.7(a)), alleging that defendant, having been previously convicted of unlawful delivery of a controlled substance in Jefferson County, Illinois (case Nos. 2010-CF-182, 2011-CF-134), knowingly possessed a firearm.

¶ 6      The charges stemmed from a July 4, 2021, shooting in the parking lot of the Corner Tavern in Mount Vernon, Illinois. Defendant arrived at the Corner Tavern with several individuals, including defendant's girlfriend, Amiyah Williams, and Williams's friend, Amiyah Caldwell, at approximately 1:30 a.m. on Sunday, July 4, 2021, following defendant's cousin's wedding. Between approximately 2:05:30 a.m. and 2:07 a.m., surveillance footage from the Corner Tavern showed defendant looking for someone in the parking lot of the Corner Tavern. At this time,

defendant moved side to side, bounced on his feet and rubbed his hands together, while he intermittingly talked to people around him. At approximately 2:07:16 a.m., defendant saw Jamarco move towards the back door of the bar, prompting defendant to "adjust[ ] [his] firearm," testifying that he wanted "to make sure it's in the spot [if he] need[ed] to get to it." Defendant quickly followed Jamarco into the bar. At approximately 2:07:20 a.m., surveillance footage showed Jamarco open the back door, look behind himself, and enter the bar. Three seconds later, defendant entered the bar through the back door. The surveillance footage then showed Williams and Caldwell quickly follow defendant into the bar. Next, surveillance footage inside the bar showed a male, Elber Washup, pull defendant's arm and hold defendant back. After the two men briefly spoke to one another, defendant turned around and exited the bar through the back door at 2:07:55 a.m. Defendant then stood in the parking lot pacing back and forth and looking at the building multiple times. At 2:09:35 a.m., defendant walked near the back door, at which point he lingered, bounced side to side on his feet, and continued to watch the back door.

¶ 7    At 2:10:10 a.m., Jamarco exited the bar through the back door with another male. At 2:10:16 a.m., Jamarco walked up to defendant and Williams in the parking lot. As the men exchanged words, they continued to get closer to one another, and Williams attempted to step in and create distance between the two men. As the men walked closer to one another, defendant reached for his right waistband, while Jamarco bent his right elbow with his right hand over his Gucci shoulder bag. At 2:10:19 a.m., defendant pulled his gun from his waistband and shot near Jamarco's face, missing Jamarco. At this time, Jamarco turned to his left side, landing briefly into a bent over position with his back to defendant. Defendant shot Jamarco a second time, causing Jamarco to fall down. As Jamarco attempted to run from defendant, defendant shot at Jamarco two more times. At approximately 2:10:23 a.m., the surveillance footage showed Jamarco stumbling

3

towards a black car owned by Billy Ballard as Jamarco ran behind the driver's side door. The reflection off the driver's side door shows Jamarco's white clothing. At 2:10:24 a.m., defendant shot at Jamarco two more times, totaling six gunshots within five seconds. During shots four to six, defendant, with his left hand in the air, moved closer in Jamarco's direction as he fired his gun. The surveillance footage closest to the brick wall showed five people run between the parked cars and the brick wall during the shooting. Defendant, who testified at trial that Jamarco continued to run behind the cars while reaching for his gun, quickly moved to his right and fired two more shots, totaling eight rounds, at the parked cars.

¶ 8     Following the shooting, defendant fled the county and hid in a hotel. Once law enforcement arrived at the scene of the shooting, officers located Jamarco deceased in the fetal position in front of a black car parked closest to the entrance of the back door. Officers also discovered folded-up money in and around Jamarco's Gucci shoulder bag, as well as a semiautomatic gun, specifically, a 9 millimeter, Glock with an extended magazine, in Jamarco's bag. Jamarco's bag was unzipped; however, officers confirmed that his gun never left his shoulder bag.

¶ 9     On May 13, 2022, defendant filed a notice of defense, stating that he maintained that any alleged use of force was justified as it was necessary to prevent imminent death or great bodily harm to defendant or another or the commission of a forcible felony. On that same day, defendant's counsel requested for leave of court to withdraw as counsel, which the trial court denied following objection by the State. Defendant subsequently filed a motion to substitute counsel on July 21, 2022, which the court granted without objection.

¶ 10    On October 6, 2022, the State filed a motion *in limine* regarding *Lynch*[1] evidence, contending that defendant was the initial aggressor on July 4, 2021. The State requested the trial court preclude defense counsel from referring to allegations of misconduct and prior bad acts allegedly committed by Jamarco prior to July 4, 2021, including allegations of misconduct that were never reported to police and did not result in criminal convictions.

¶ 11    On October 31, 2022, defendant filed a notice of affirmative defense, stating his intent to establish the affirmative defense of use of force in defense of person as to the charges of first degree murder and aggravated discharge of a firearm. Defendant also filed a notice of intent to submit to the jury the lesser-mitigated offense of second degree murder.

¶ 12    On November 3, 2022, defendant filed a motion *in limine* requesting the trial court preclude the State from mentioning any evidence of defendant's prior contact with police, arrests that did not result in convictions, any prior convictions, and any prior bad acts. That same day, defendant filed a response to the State's motion *in limine* concerning *Lynch* evidence, wherein defendant denied he was the initial aggressor on July 4, 2021. Defendant sought to present Jamarco's aggressive and violent character concerning events between defendant and Jamarco that occurred in the weeks leading up to the shooting. Defendant noted that he did not report these events to police and no convictions resulted. In addition, defendant sought to present prior charges against Jamarco of aggravated battery and domestic battery (case No. 2006-CF-508) and unlawful restraint (case No. 2011-CF-300). Defendant asserted that *Lynch* applied to his case, where his knowledge of Jamarco's violent tendencies necessarily affected defendant's perceptions of, and reactions to, Jamarco's behavior on July 4, 2021, and the evidence of Jamarco's propensity for violence tended

---

[1]When a defendant asserts self-defense, evidence of the victim's aggressive and violent character may support a self-defense claim by showing the defendant's knowledge of the victim's aggressive and violent character affected his perception of the victim's actions and his reaction to those actions. See *People v. Lynch*, 104 Ill. 2d 194, 200 (1984).

to support defendant's version of the facts where conflicting accounts of what happened existed. Defendant denied that the introduction of requested *Lynch* evidence would be more prejudicial than probative, irrelevant, or misleading.

¶ 13    On November 9, 2022, the trial court held a hearing on the parties' motions. Following argument by the parties, the court allowed defendant to testify about specific interactions that defendant personally experienced with Jamarco leading up to the shooting on July 4, 2021. The court, however, barred defense counsel from introducing evidence of Jamarco's prior instances of alleged violence concerning nonconvicted allegations contained in case Nos. 2006-CF-508 and 2011-CF-300. In so ruling, the court stated the following:

> "I think they would be overly prejudicial to the State because of their age. Um, one of them is 16 years old, the other one 11. Another thing is that they are at best allegations. They are—there's no conviction so this was not proven in a court of law or there was no guilty plea. I believe there was no actual—from what I understand from what I am reading and what I have heard in arguments, there was no actual carrying out of the threats alleged."

¶ 14    On November 14, 2022, defendant's jury trial began. The following evidence was adduced over the course of the next four days. Both parties played surveillance video footage during the trial and produced still frame images of the video footage for the jury.

¶ 15    A. Amiyah Caldwell

¶ 16    The State called Amiyah Caldwell to testify. Prior to the shooting at the Corner Tavern, Caldwell and Williams, defendant's girlfriend, spent time at defendant's mother's house. Early in the morning on July 4, 2021, Caldwell drove defendant and Williams to the Corner Tavern. Upon arrival, Caldwell and Williams followed defendant through the bar while he walked around "trying to look for something." Initially, she did not know who defendant was looking for when they arrived at the bar. However, Caldwell, who stood near defendant outside the Corner Tavern prior to the shooting, later realized that defendant was looking for Jamarco when "they [(defendant and

6

Jamarco)] both approached each other." Although Caldwell did not remember what the men said to each other, she testified that she heard gunshots, prompting her to run back to her car. Following the shooting, defendant and Caldwell left in her car after defendant told her to drive. Caldwell testified that "everybody knew that [defendant and Jamarco were] beefing, but nobody knew it would get that far."

¶ 17   Caldwell also testified that she provided a statement to Detective Sergeant Jeremy Reichert of the Mount Vernon Police Department on July 4, 2021. At that time, Caldwell stated that defendant arrived at the Corner Tavern and, referring to Jamarco, stated, " 'Where is that n*** at?' " Defendant also told Caldwell that "he wanted to talk to [Jamarco] and hash things out, or it would be bad."

¶ 18   B. Dr. Marissa Feeney

¶ 19   Dr. Marissa Feeney, an expert in the area of forensic pathology, testified to the following. Dr. Feeney completed Jamarco's autopsy on July 5, 2021, and testified to her findings. Jamarco had four gunshot wounds to his right hip, left lower back, left upper buttocks, and posterior right thigh. Dr. Feeney did not believe it was possible to inflict the right hip injury if defendant and Jamarco stood face-to-face. Dr. Feeney determined Jamarco's cause of death was gunshot wounds of "his torso and lower extremity with perforation of his heart, pulmonary artery, lung, liver, stomach, pancreas, and small bowel." On cross-examination, Dr. Feeney confirmed that there was a possibility that Jamarco's right hip injury could have occurred if Jamarco turned his right side toward the shooter and bent over.

¶ 20   C. James Goldman

¶ 21   James Goldman, the owner of the Corner Tavern, testified to the following. Goldman ran security at the Corner Tavern on July 3 and July 4, 2021. He testified that he installed and operated

7

16 surveillance cameras inside and outside of the Corner Tavern. In the early morning hours of July 4, 2021, Goldman was watching his security cameras when he heard gunshots. Goldman immediately looked out his window when he saw defendant "hopping across the parking lot with one arm up in the air, side stepping, pulling a trigger of[ ] the gun." Goldman, however, did not see defendant shoot Jamarco. Following the shooting, Goldman walked around the bar to "ma[k]e sure everybody was safe" when he saw defendant "r[u]n back into my parking lot, and he throwed [*sic*] up his arms and said something" that Goldman could not hear.

¶ 22    On cross-examination, Goldman acknowledged that a patron could exit the bar through the back door into the parking lot and also around a fence near the outdoor smoking area. Goldman indicated that his surveillance videos did not have audio capabilities, thus, he did not know what defendant and Jamarco said to each other prior to the shooting. Goldman stated that he immediately saw Jamarco bleeding on the ground after he walked outside following the shooting.

¶ 23    D. Billy Ballard

¶ 24    Billy Ballard, a friend of Goldman and regular patron of the Corner Tavern, testified to the following. Ballard arrived at the Corner Tavern between 5 and 6 p.m. on July 3, 2021, to clean for Goldman. During the course of the evening, Ballard "could feel the tension in the bar" between "[t]wo people that was [*sic*] in the bar." Ballard personally noticed "movement[ ] inside the bar," including movement and commotion between defendant and Jamarco and the two going in and out of the back door. While sitting in the smoke room, Ballard heard "[a] big commotion, people arguing," although he could not make out the exact words. After Ballard saw Jamarco leave the bar through the back door, he heard multiple gunshots. Ballard, while looking over his right shoulder and out of a window in the smoke room, saw defendant firing a gun. Following the shooting, Ballard walked outside and observed Jamarco "leaning down in front of the bumper [of

Ballard's black car] *** in the fetal position" positioned between Ballard's car and brick wall of the bar. On cross-examination, Ballard testified that 200 people were outside on the parking lot of the Corner Tavern on the night of the shooting. Ballard testified that Jamarco arrived at the bar before defendant. Ballard then acknowledged that he initially told law enforcement that defendant arrived at the bar first.

¶ 25    E. Jeremy Reichert

¶ 26    Detective Sergeant Jeremy Reichert, a veteran officer and crime scene investigator with the Mount Vernon Police Department, testified to the following. While investigating the scene, Detective Sergeant Reichert discovered U.S. currency and a Gucci shoulder bag "close to the building." Officers informed Detective Sergeant Reichert that Jamarco fell in front of a vehicle where emergency personnel rendered aid. Detective Sergeant Reichert confirmed that Jamarco's unzipped Gucci shoulder bag contained both folded-up money and a semiautomatic handgun. On cross-examination, Detective Sergeant Reichert confirmed that the Corner Tavern had two entrances. He also testified that he processed Jamarco's gun and removed the extended magazine where he found a live round of ammunition in the chamber. Detective Sergeant Reichert also interviewed Caldwell, who informed him that Jamarco "came around the side of the building and 'steady walked up on [defendant].' "

¶ 27    F. Jeremy Osborn

¶ 28    Detective Jeremy Osborn of the Mount Vernon Police Department testified to the following. Detective Osborn conducted surveillance on defendant at the Drury Hotel in O'Fallon, Illinois, on July 6 or July 7, 2021, in connection with the United States Marshal's task force. At some point, defendant exited the hotel and entered a gold Cadillac registered to Walter Gardner

9

but driven by Williams. Detective Osborn approached the Cadillac, removed defendant from the vehicle, and took defendant into custody.

¶ 29 After the State rested, defense counsel moved for a directed verdict, arguing that the evidence, even if viewed in the light most favorable to the State, failed to make a *prima facie* case that a reasonable fact finder could find beyond a reasonable doubt that the State proved all of the charges against defendant. Specifically, defense counsel argued that "the victim does approach [defendant] immediately before the shots are fired, and [Jamarco] is moving his arm towards his bag in which there was a gun found." The State responded, arguing that no evidence existed that defendant knew Jamarco's Gucci shoulder bag contained a gun. Instead, the State argued that the evidence showed defendant as the initial aggressor, stating that defendant "went to the bar seeking to have a confrontation with [Jamarco]." The State argued that defendant "was restrained physically once from attempting to make contact with [Jamarco]. And that he then waited directly outside the exit of the bar for [Jamarco]." The State continued to argue that defense counsel "characterize[s] it as [Jamarco] approaching [defendant], but as your Honor saw the evidence, [Jamarco], assuming he left the bar out that door, had nowhere to go but in the direction of the Defendant." Defense counsel responded, arguing that Goldman indicated that "other methods of leaving the bar existed," which included "going around the outside smoking area or going out the door in the bar itself." Following argument by the parties, the trial court denied defense counsel's motion for a directed verdict. Defense counsel subsequently informed the court of her intention to call defendant to testify.

¶ 30 G. Defendant

¶ 31 Defendant testified to the following on his own behalf. Defendant, the father of two children, J.J., a male, and P.G., a female, testified that he dated Williams, Jamarco's cousin, on

10

July 4, 2021. Prior to dating Williams, defendant dated Crystal Diaz, who also dated Jamarco at some point. On July 4, 2021, defendant's son's mother, Candace Aikman, dated Jamarco, who she had dated for years. Defendant testified that he knew Jamarco "all my life," sharing that the two men were close, attended school together, and grew up in the same neighborhood. Defendant testified that his relationship with Jamarco changed in February or March 2021 after J.J. posted a picture of marijuana for sale on Snapchat. J.J. informed defendant that Jamarco had marijuana in his house. Defendant then approached Jamarco at Jermaine Brown's home and asked Jamarco to remove the marijuana from his house. According to defendant, Jamarco became upset and started to yell and curse at defendant. Jamarco then left Jermaine's house, walked around the corner to his sister's house, and came back with a gun—the same gun in Jamarco's possession on July 4, 2021. Defendant testified to the following:

> "Q. [DEFENSE ATTORNEY]: How did the fact that after you confronted Jamarco he gets a gun, how did that affect your thoughts on July 4th, 2021?
> A. I wish we could have talked about it and not came [*sic*] to the gun situation.
> Q. Were you afraid when he got that gun after you talked to him about the weed?
> A. Yes.
> Q. *** How did you get out of that situation at Jermaine Brown's house when he got that gun?
> A. I pulled off. I was in a car when he did it."

Defendant also testified that Lamont Edwards informed defendant in late May 2021 that Jamarco made threats about defendant following the incident at Jermaine's house. Defendant felt scared that Jamarco "was going to kill [him]. [Jamarco] told Lamont to stay out of the car with [defendant] because [Jamarco] didn't want [Lamont] to be in there when [Jamarco] shot the car up."

¶ 32    Next, defendant testified about an incident outside of his friend Joe Buie's house in late May 2021 when Jamarco pulled up in his white Durango and "pulled a gun out and pointed it outside his window towards" defendant. Defendant testified that his friend, Tyrone Alexander, witnessed Jamarco with a gun in his hand. Defendant "jumped in [his] car and pulled off."

11

Defendant felt scared again. Defendant testified that Jamarco pointed a gun—the same gun in Jamarco's possession on July 4, 2021—at him outside of Buie's house.

¶ 33 Next, defendant testified to an incident between Jamarco and defendant at the Corner Tavern on June 18, 2021. After defendant and his friend, Dasmin Young, arrived at the Corner Tavern between 12 a.m. and 12:30 a.m., Jamarco saw defendant, jumped into his pickup truck, and pulled out of the parking lot. Jamarco returned 10 to 15 minutes later in a white Durango, parked in the parking lot of the Corner Tavern, but he "never got back out of his car *** the whole night." When defendant, Dasmin, and defendant's cousin, Ratasha Turner, left the Corner Tavern between 2:15 a.m. and 2:30 a.m., defendant "noticed Jamarco was parked right there close by where [defendant] was parked [in a vacant house parking spot]. And as soon as [defendant] went to walk past [Jamarco's] car, [Jamarco] opened the car door and jumped out with a gun"—the same gun in Jamarco's possession on July 4, 2021. Dasmin and Ratasha stepped in to break up the incident, and defendant jumped in his vehicle. Jamarco then got in his white Durango and tried to block defendant's vehicle from leaving. Defendant testified that he "was able to still get up out of there and leave." Defendant testified that he "feared for [his] life" because "[i]t's not the first or the second time [Jamarco] has ever pulled a gun on [him]."

¶ 34 Next, defendant testified to an incident between Jamarco and defendant at Forest Park in St. Louis, Missouri, on June 19, 2021, around 2 p.m. Defendant testified that Jamarco arrived in his white Durango about 10 minutes later, parked about 10 feet from defendant and Williams, and waved his handgun—the same gun in Jamarco's possession on July 4, 2021—from out of his window. Defendant felt scared. Defendant did not immediately leave but stayed for fireworks and then left shortly after 8 p.m.

¶ 35    Next, defendant testified about an incident on July 1, 2021, that took place outside of defendant's mother's house in Mount Vernon, Illinois. After smoking marijuana in his car with a friend, Sheekar Young, defendant exited his car and Jamarco immediately drove by in his white Durango, rolled down his window, pointed a gun at defendant—the same gun in Jamarco's possession on July 4, 2021—and said to defendant, "I should have shoot [*sic*] you." Defendant felt scared. Defendant confirmed that Jamarco threatened him with a gun five times following the conversation about J.J.'s access to Jamarco's marijuana. Defendant then testified that a friend, Carey Richardson, informed him on the evening of July 3, 2021, that Jamarco threatened defendant's life, stating: "Jamarco told [Richardson] that something got to be done because this ain't [*sic*] the first time [Jamarco] and [defendant] have been into it." Defendant felt scared because Jamarco "threaten[ed] to kill [him]."

¶ 36    Defendant confirmed that he and Jamarco pulled guns on each other in 2010, but friends stepped in and ended the dispute. Defendant also confirmed that he never told police, stating: "What [are] the police going to do? He done [*sic*] threatened the police officers before." The State objected, and defense counsel withdrew the question. Defense counsel then asked defendant if Jamarco threatened police before, and the State objected. The trial court sustained the objection, and defense counsel responded that she was "simply trying to lay a foundation for [defendant's] awareness of reputation." Following lengthy argument by the parties outside the presence of the jury, the court allowed defense counsel to make an offer or proof regarding Jamarco's generalized reputation:

> "[DEFENSE COUNSEL]: Okay. How long have you known Jamarco?
> THE DEFENDANT: All my life.
> [DEFENSE COUNSEL]: Okay. You previously said on direct that you went to school together?
> THE DEFENDANT: Yes, ma'am.

[DEFENSE COUNSEL]: Previously said on direct that you \*\*\* grew up in the same neighborhood?

THE DEFENDANT: Yes, ma'am.

[DEFENSE COUNSEL]: Did you hang around the same people?

THE DEFENDANT: Yes, ma'am.

[DEFENSE COUNSEL]: Are you aware of his associates within your neighborhood?

THE DEFENDANT: Yes, ma'am.

\* \* \*

[DEFENSE COUNSEL]: Are you aware of his reputation within the community?

THE DEFENDANT: Yes, ma'am.

[DEFENSE COUNSEL]: How are you aware of his reputation within the community?

THE DEFENDANT: Because I know—everybody know [*sic*] each other around here to be honest, and I—we hang around the same people. He had threatened friends of mine. I know friends of his that we don't hang around. Like, we all know each other around here, and we all hang around in the same parts of the neighborhood.

[DEFENSE COUNSEL]: Without going into specific details, what do you know his reputation for violence to be?

THE DEFENDANT: That he's violent. That he is known to carry guns. He's known for shooting at people.

[THE STATE]: Objection.

[THE STATE]: There's not been any suggestion he shot at anybody that I have heard.

THE COURT: Well, let's let him—let's make this offer of proof and then we can take that up.

[DEFENSE COUNSEL]: Did the reputation of just he's a violent person, again not getting into specifics, affect your thoughts and your behaviors on July 4th, 2021?

THE DEFENDANT: Yes, ma'am."

¶ 37 Following this testimony, the State requested additional time to research reputation evidence, defense counsel agreed, and the trial court took a recess. Following lunch, the State made an oral motion requesting the court exclude "generalized reputation character evidence" of Jamarco. The State asserted the following:

"Defendant, through his personal knowledge, which was properly admitted under *[People v.] Lynch* \*\*\*, talked about all the other incidences in which he thought that [Jamarco] might have a gun. I don't even know that the Defendant has clearly stated that on this particular occasion he knew the victim to have a gun just because he previously had a gun. So, the initial aggressor I think needs to be the very first and foremost prong that is satisfied before we get to reputation, otherwise under [Rule] 404 it is not allowed."

14

Following argument by the parties, the court reserved ruling to view additional video surveillance footage to determine if conflicting evidence existed as to the initial aggressor. The State then made an oral motion *in limine* to exclude any references to Jamarco's prior felony convictions, and defense counsel agreed.

¶ 38   Defense counsel then continued defendant's direct examination. Defendant testified that he did not report or call police after Jamarco threatened him or brandished a gun because he did not believe the police would do anything. Specific to July 4, 2021, defendant went to the Corner Tavern at 1:33 a.m. after his cousin's wedding with Caldwell and Williams. When they arrived at the Corner Tavern, defendant noticed Jamarco's pickup truck in the entrance of the parking lot. Because the parking lot was full, Caldwell parked her car a block away from the Corner Tavern on 19th and Conger on a friend's private lot.

¶ 39   When he walked through the parking lot of the Corner Tavern, defendant saw Jamarco standing next to a black Cadillac talking to other males. Contrary to Caldwell's testimony, defendant denied that he asked people "where that N word at" when he arrived at the bar, stating: "Because I already had seen Jamarco." Specific to the surveillance footage, defendant testified that he bounced and danced around because there was hip hop music playing. Defendant confirmed that he rubbed his hands together, stating, "That's something I always end up doing." Defendant was looking at Jamarco because Jamarco threatened him, and he wanted to know Jamarco's location at all times. Defendant agreed that he followed Jamarco into the bar area because he felt "that was the right time to try to squash everything that we had going on." Once defendant entered the bar, his friend, Elber Washup, grabbed him, which upset defendant because Elber "made a scene." Defendant then walked outside.

15

¶ 40    Once outside, Jamarco "walked up on me," and defendant saw a gun in Jamarco's open Gucci shoulder bag. As Jamarco walked up to defendant, who was with Williams and his cousin, "Tater Head," Jamarco said, "Chico, it's like that. I told you one of us is going to die tonight." When asked what Jamarco meant, defendant testified that Jamarco "sw[o]r[e] to God, but that's his deceased father that he's swearing on." Within seconds, Jamarco was within two or three feet of defendant, and defendant "noticed [Jamarco] walking up and he [*sic*] reaching, prior to him pulling a firearm on me [(defendant)] grabbed [his] gun" and shot at Jamarco. Defendant shot at Jamarco because he "didn't know what to think [and] didn't know what [Jamarco] was going do" since Jamarco was drunk and high. Defendant testified that, as Jamarco approached him, Jamarco "reach[ed] for his bag" with his right hand and extended his arm back farther over the Gucci bag.

¶ 41    After the first shot, defendant continued to shoot because Jamarco "was still up and moving and reaching for that gun." According to defendant, he never saw Jamarco fall. Defendant believed that he fired eight or nine shots until the magazine was empty. After defendant stopped shooting, Richardson pulled a gun on defendant; however, neither Richardson nor defendant shot at each other. The surveillance footage did not capture this exchange. Defendant testified that he fled the scene because he feared for his life, stating that he did not know what to expect after Richardson pointed a gun at him. Defendant immediately went to his mother's house following the shooting, then to his girlfriend's house in Woodlawn, Illinois, then to Centralia, Illinois, and finally fled to Carbondale, Illinois. At some point, defendant disposed of his gun in Rend Lake. Defendant finally testified that he believed he "needed to fire as many shots as [he] did" or else he would "[p]robably not be here today."

¶ 42    On cross-examination, defendant testified that he continued to shoot at Jamarco because Jamarco "was still reaching for the bag and he was still up moving." Defendant confirmed that he

16

reached for his gun "right after [Jamarco said] one of us is going to die tonight *** and he was still reaching." Defendant testified that he bought his gun after Jamarco pulled his gun on defendant the first time. According to defendant, he never carried or pointed his gun at Jamarco when Jamarco threatened him prior to July 4, 2021, because he was a felon.

¶ 43 Defendant, who smoked marijuana since he was 12 or 13 years old, smoked marijuana on July 3, 2021, before his cousin's wedding. Defendant admitted that he never reported the presence of drugs in J.J.'s mom's house. Defendant confirmed that Jamarco pointed a gun at him five times, but Jamarco never shot at defendant. Defendant agreed that all of his "people kn[e]w that Jamarco's running around pulling a gun on [him]."

¶ 44 Defendant admitted that he carried a loaded gun to the Corner Tavern on July 4, 2021, to protect himself from Jamarco. Defendant agreed that he traveled the length of three cars before he fired the last shot because "Jamarco was still moving, reaching for his firearm." Defendant testified that the surveillance footage showed him "adjusting [his] firearm" "to make sure it's in the spot to where I need to get to it" after he and Jamarco "locked eyes," and Jamarco "got to moving to go inside the bar." Specific to this situation, defendant agreed that he placed his hand on his firearm when Jamarco was not looking at him. Defendant denied chasing Jamarco into the bar but stated that he walked inside to talk to Jamarco. Although defendant agreed that he stood in front of, and faced, the back door, he denied that he waited for Jamarco to talk to him after he exited the bar.

¶ 45 Defendant then claimed that he grabbed for his gun when he noticed Jamarco's gun in his Gucci shoulder bag, stating: "You can see the magazine of his gun sticking out of that bag." Defendant agreed that Jamarco never reached "all the way in the[ ] [bag], but he was able to get enough in there to where I seen [*sic*] that he was getting that gun." Defendant specified that Jamarco had "[t]wo or three inches of his fingertips" in this shoulder bag when defendant started

17

to shoot. Defendant agreed, however, that Jamarco's "hand and elbow area [we]re above the bag the whole time," and that Jamarco would have needed to reach "farther down to pull [the gun] out" of the bag. Defendant agreed that Jamarco never straightened his elbow down to grab the gun.

¶ 46 Defendant testified that he "wasn't aiming at nothing [*sic*]" when he shot Jamarco the first time to explain why the first bullet went over Jamarco's head. Defendant denied that he tried to shoot Jamarco in the head. According to defendant, Jamarco's "sudden movement," which caused him to pull the trigger, was Jamarco "still coming towards [him]." Defendant denied speaking to Jamarco as Jamarco approached him. Defendant testified that he fired the second shot because Jamarco continued to reach for his bag. Defendant agreed that the surveillance footage depicted Jamarco falling at 2:10:19 a.m. One second later, defendant shot again at Jamarco. Jamarco ran but did not reach for his firearm at this point. Defendant agreed that he continued to fire but denied aiming his gun at Jamarco. Instead, he testified that he kept shooting because "[w]hen [Jamarco] got around these cars, that's why [he] kept firing the firearm." Defendant acknowledged that he kept firing as Jamarco ran away.

¶ 47 Prior to redirect examination, the trial court addressed the State's motion *in limine* concerning Jamarco's reputation in the community, and the following conversation took place:

> "THE COURT: *** [I]t was my understanding that you [(the State)] were moving that *** any evidence as to the victim's reputation *** not be allowed to be presented or did I get that incorrect? Because the Court has already *** ruled previously, um, on the State's motion *in limine* as to evidence of the second prong of the *Lynch* case which has to do with evidence that's not necessarily known to the Defendant. And that had to do with 06-CF-508 and 11-CF-300, which were Jefferson County cases and which one had to do with the victim's alleged threat to Officer James Kemp and had to do with alleged threats to Atavia Johnson and Crystal Diaz I think. Am I getting that wrong, counsel?
> [DEFENSE COUNSEL]: No, your Honor.
> [THE STATE]: No, your Honor.
> THE COURT: The Court ruled on that and ruled that that could not come up because it was too old and they were not convictions. That leaves the other prong of the *Lynch* which has to do with things that, as I understood in the arguments in that first written State's motion *in limine*, that the defense was actually requesting—initially requesting that

18

I order *** [defense counsel] to disclose things that she had been told by the Defendant, which would be privileged information. That she was asking that I order her to disclose that to the State.

* * *

THE COURT: Well, then the question I have is, [defense counsel], are you asking then to present further as to the victim's reputation in the community for violence? Is that what you are asking to do?

[DEFENSE COUNSEL]: If given the opportunity on redirect examination, I would ask the question. But pursuant to the *Buchanan* case that was cited that says that the court can rule that something is cumulative in terms of first prong *Lynch* evidence, I believe several times even on his cross examination [defendant] said people know Jamarco, I know Jamarco, I know how he is such that I think there was sufficient enough reputation brought out without going down the more complicated avenue of true reputation evidence without talking about specifics.

THE COURT: Okay. So, am I to understand that you are confessing the State's motion?

[DEFENSE COUNSEL]: I would, at this point."

¶ 48    On redirect examination, defendant testified that, even though the surveillance video did not show him move his head down, he moved his eyes down to see the gun in Jamarco's bag. Defendant agreed that Jamarco "fell or stumbled" after the first shot. However, Jamarco recovered his stance "as soon as he got up and went by that first black car" near the bar. Defendant agreed that the surveillance footage did not show Jamarco behind the cars, but defendant believed Jamarco was "recovering visibl[y]." Defendant, again, testified that Jamarco was "still reaching for his firearm" when he fired shots two through eight.

¶ 49    On recross-examination, defendant testified that the Corner Tavern, a bar he frequented every weekend, closed at 2 a.m. Defendant admitted that he "wasn't thinking" when he fired at Jamarco, stating: "All I knew there was a threat in front of me threatening me with a firearm to kill me." When asked if defendant was concerned about other people when he fired his gun eight times, defendant stated: "We was [*sic*] outside the bar." Defendant further testified that he did not know whether a bullet could pass through something and strike someone. Defendant testified that he did not intend to strike Jamarco, testifying that he "didn't even know [Jamarco] was shot." Despite the

19

injuries Jamarco sustained, defendant testified that Jamarco "got up and ran the length of four cars."

¶ 50   On redirect examination, defendant testified that he did not intend to shoot Jamarco. Instead, he "was shooting towards him but [he] wasn't aiming. [He] was just shooting."

¶ 51   H. Sergeant Reichert

¶ 52   Sergeant Reichert testified that he examined and photographed the crime scene. He testified that Jamarco's blood was limited to the area in front of Ballard's car, which was the first car parked closest to the bar. Sergeant Reichert agreed that no evidence showed that Jamarco moved any further than this vehicle.

¶ 53   On cross-examination, Sergeant Reichert confirmed that the only blood stain he found was located near Ballard's car. Sergeant Reichert testified that the surveillance footage did not show Jamarco after he took cover near Ballard's car. Sergeant Reichert clarified that he was not aware of a camera angle that could have captured Jamarco between the brick wall and the front end of Ballard's car. Sergeant Reichert confirmed that a victim does not always fall where they are shot. On recross-examination, Sergeant Reichert confirmed that people do not always fall and die at the spot where they are shot.

¶ 54   The State rested again, and the parties proceeded to closing arguments. Following deliberations, the jury unanimously found defendant guilty of first degree murder, aggravated discharge of a firearm, and armed habitual criminal.

¶ 55   On December 16, 2022, defendant filed a posttrial motion, arguing that the trial court erred by denying (1) defendant's motion to appoint a special prosecutor, (2) defendant's motion to continue and supplement defendant's motion to continue, (3) defendant's motion *in limine* to exclude defendant's prior convictions in Jefferson County, (4) defendant's response and

supplement to his response concerning *Lynch* evidence in his motion *in limine*, and (5) defendant's motion for a directed verdict. In addition, defendant argued that the court improperly ruled on evidentiary objections made during defendant's testimony and erred by providing Illinois Pattern Jury Instructions, Criminal, No. 24-25.11 (4th ed. 2000) ("A person is not justified in the use of force if he initially provokes the use of force against himself with the intent to use that force as an excuse to inflict bodily harm upon the other person."). Defendant also argued that the State improperly shifted the burden of proof in rebuttal and failed to prove defendant guilty beyond a reasonable doubt. The court denied the motion.

¶ 56    On April 6, 2023, the trial court sentenced defendant to 80 years in prison followed by 6 years of MSR. Specifically, the court sentenced defendant to 35 years in prison on the first degree murder conviction with a mandatory 35-year firearm enhancement followed by 3 years' MSR. Additionally, the court imposed a 10-year sentence followed by 3 years' MSR for the armed habitual criminal conviction to run consecutively with the first degree murder conviction. Defendant subsequently filed a timely motion to reconsider sentence, which the court denied.

¶ 57    Defendant filed a timely notice of appeal.

¶ 58                                   II. Analysis

¶ 59                A. Reduction of Conviction to Second Degree Murder

¶ 60    Defendant first argues on appeal that this court should reduce his conviction to second degree murder, where defendant proved, by a preponderance of the evidence, that he had an actual, albeit unreasonable, belief to act with deadly force when Jamarco "charged at him with a loaded gun in his bag." We disagree.

¶ 61    As charged in this case, to sustain a conviction for first degree murder, the State must prove that a defendant killed another individual without lawful justification, and in performing the acts

21

which caused the death, he intended to kill or do great bodily harm or knew that his acts created a strong probability of death or great bodily harm to that individual. 720 ILCS 5/9-1(a)(1), (2) (West 2020). Second degree murder is a lesser mitigated, not a lesser included offense, of first degree murder. *People v. Bennett*, 2017 IL App (1st) 151619, ¶ 43 (citing *People v. Jeffries*, 164 Ill. 2d 104, 122-23 (1995)). A person commits the offense of second degree murder when he commits the offense of first degree murder, as defined by paragraphs (1) and (2) of subsection (a) of section 9-1 of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(1)-(2) (West 2020)), and either of the following mitigating factors is present:

"(1) at the time of the killing he or she is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he or she negligently or accidentally causes the death of the individual killed; or

(2) at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his or her belief is unreasonable." *Id.* § 9-1(a)(1)-(2).

¶ 62 The imperfect self-defense form of second degree murder occurs when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable. *Jeffries*, 164 Ill. 2d at 113. Self-defense consists of six factors: "(1) force is threatened against a person, (2) the person is not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, (5) the person actually and subjectively believed a danger existed that required the use of force applied, and (6) the person's beliefs were objectively reasonable." *People v. Washington*, 2012 IL 110283, ¶ 35. To sustain a charge of first degree murder after a defendant raises the issue of self-defense, the State must prove beyond a reasonable

22

doubt that at least one of the six factors was present. *Jeffries*, 164 Ill. 2d at 128. However, when a defendant seeks to mitigate an offense from first degree murder to second degree murder, he bears the burden of proving by a preponderance of the evidence that all of the first five factors were present. *Id.* at 129.

¶ 63 The question of whether a defendant's actions were committed under mitigating circumstances—here, the question of whether defendant unreasonably believed that the circumstances justifying the use of lethal force were present—presented a question of fact. *People v. Romero*, 387 Ill. App. 3d 954, 967-68 (2008). When reviewing a defendant's argument that he presented evidence to prove the existence of a mitigating factor, the reviewing court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were not present." *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996).

¶ 64 After reviewing the evidence in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found that the mitigating factors were not present to justify defendant's use of lethal force when he shot Jamarco. Defendant claims that Jamarco charged at him and "bee-lined" for defendant with a loaded gun while threatening defendant that "one of them was going to die that night." We simply cannot conclude that the evidence supports defendant's belief that shooting Jamarco "was the only way for him to escape his own death," as he claims on appeal. Aside from defendant's own self-serving testimony, the video evidence disproves defendant's version of events. The surveillance footage depicted defendant in a heated state prior to the shooting. Defendant seemed agitated and preoccupied, and bystanders, including Caldwell and Ballard, testified that they sensed commotion as defendant looked for "something." The evidence demonstrated that defendant was looking for Jamarco when he arrived at the Corner

23

Tavern at 1:33 a.m. on July 4, 2021—less than 30 minutes before the bar—a bar defendant frequented every weekend—closed at 2 a.m.

¶ 65    While in the parking lot of the Corner Tavern, defendant saw Jamarco enter the building through the back door, at which time defendant pursued Jamarco. Defendant admitted that he adjusted his gun on his waist to "make sure that it's in the spot to where [he] need[ed] to get to it" after he saw Jamarco. Once defendant entered the bar after Jamarco, another male held defendant back, pulled his arm, and persuaded defendant to exit the bar, which he did. Defendant then stood in the parking lot pacing back and forth and looking at the building, presumably, the back door, multiple times. At 2:09:35 a.m., defendant walked near the back door and lingered, bouncing side to side, and continuing to watch the building. At 2:10:10 a.m., Jamarco exited the building through the back door with another male. Approximately six seconds later, at 2:10:16 a.m., Jamarco walked towards defendant. Our review of the surveillance footage does not support defendant's claim that Jamarco charged or made a beeline towards defendant. Defendant claims that he said nothing to Jamarco as the men moved closer to each other, while Jamarco allegedly threatened defendant verbally, stating: "Chico, it's like that. I told you one of us is going to die tonight." While the surveillance footage does not contain audio, the jury could have reasonably found it unlikely that defendant simply said nothing to Jamarco at this time, especially given the fact that video evidence demonstrates that defendant placed his right hand near the gun on his waist during this short verbal exchange.

¶ 66    At this time, Jamarco approached defendant with his right arm slightly bent over the Gucci shoulder bag on his right side. Importantly, defendant testified that Jamarco's hand and elbow area were above the shoulder bag the whole time, and that Jamarco would have needed to reach "farther down to pull [the gun] out" of the bag at the time defendant shot him. Prior to the shooting,

24

defendant and Jamarco stepped closer to one another, and Williams attempted to create distance between the men. At 2:10:19 a.m., however, defendant quickly lifted up his right hand and shot in the area of Jamarco's face. Following the first shot, the crowd scattered while Jamarco turned to his left side in a bent over manner. With Jamarco's back to defendant, defendant shot Jamarco a second time, causing Jamarco to stumble to the ground. Defendant then shot at Jamarco two more times. Jamarco continued to run away from defendant while stumbling towards the ground. The surveillance footage at approximately 2:10:23 a.m. showed Jamarco attempting to hide behind Ballard's black car as he ran behind the open driver's side door. At 2:10:24 a.m., defendant shot at Jamarco two more times. At this point, defendant fired six shots within five seconds. During shots four to six, defendant, with his left hand in the air, moved closer in Jamarco's direction.

¶ 67 After viewing the surveillance footage, the jury could have reasonably concluded that Jamarco did not attempt to fight back or reach for his gun once defendant started to shoot at him. The footage demonstrated that Jamarco continued to run from defendant after defendant began shooting at him. We note that additional video evidence showed five people run between the parked cars and the brick wall during the shooting. Even if Jamarco was one of these individuals, as defendant claims, the camera footage depicts these people running quickly away from defendant in the opposite direction. Importantly, Sergeant Reichert testified that the evidence did not suggest that Jamarco moved from in front of Ballard's car, sharing that Jamarco's blood and belongings were limited to the area in front of Ballard's car. Although it is undisputed that Jamarco had a loaded gun in his Gucci shoulder bag, the video evidence simply does not show that Jamarco reached for his loaded gun and pointed it at defendant. Moreover, Sergeant Reichert testified that, although Jamarco's Gucci shoulder bag was unzipped, he found Jamarco's gun inside the shoulder bag following Jamarco's death. Accordingly, viewing the evidence in a light most favorable to the

25

prosecution, we conclude that the jury could have reasonably concluded that defendant was not acting in self-defense.

¶ 68    Moreover, defendant argues that, "[g]iven [his] prior experience [with Jamarco], he had little reason to think their encounter in the bar parking lot would result in a friendly exchange or no exchange at all." Defendant's testimony included multiple instances where he claimed Jamarco pulled a gun on him, which, he argued, led him to subjectively believe that he needed to shoot Jamarco on July 4, 2021. However, defendant never testified that Jamarco shot at him during any one of these exchanges. In addition, the evidence, aside from defendant's own testimony, does not support defendant's argument that he was scared of Jamarco and feared for his life on the night of the shooting. Defendant testified that he immediately saw Jamarco's vehicle when he arrived at Corner Tavern at 1:33 a.m. He did not leave. Instead, video evidence and witness testimony demonstrated that defendant searched for Jamarco. In fact, once defendant saw Jamarco, video evidence confirmed that he checked to make sure he had his gun on him before he pursued Jamarco into the bar. Defendant testified that he pursued Jamarco because he wished to resolve their issues. However, according to defendant, his friends overreacted, urging defendant to exit the bar. Defendant subsequently walked outside to the parking lot. Despite the fact that the bar had closed approximately seven minutes early, defendant did not leave. Instead, he waited in the parking lot near the exit of the back door for two and a half minutes. Defendant could have left the bar, but, instead, he chose to stay and wait for Jamarco.

¶ 69    As discussed in detail above, viewing the evidence in a light most favorable to the State, we conclude the State's evidence negated at least one of the elements of self-defense. *Jeffries*, 164 Ill. 2d at 128 ("If the State negates *any one* of the self-defense elements, the defendant's claim of self-defense must fail." (Emphasis in original.)). Accordingly, we cannot find that defendant

26

proved, by a preponderance of the evidence, that all of the first five factors were present. Thus, we conclude that any rational trier of fact could have found that the mitigating factors were not present. We, thus, will not reduce defendant's conviction to second degree murder, and instead affirm his conviction of first degree murder.

¶ 70                                    B. Constitutional Right to a Public Trial

¶ 71    Defendant next contends that the trial court denied him his constitutional right to a public trial by excluding everyone, including his family, from the courtroom during *voir dire*. As such, defendant requests that this court reverse his convictions and remand for a new trial. The State responds that defendant forfeited review of this issue by failing to object to the trial court's courtroom closure at trial and raise the issue in a posttrial motion. Defendant argues in his reply brief, in response to the State's forfeiture argument, that this issue "did not need to be preserved," asserting that the State's contention is "misplaced as forfeiture does not apply to structural errors." We agree with the State that defendant forfeited this issue on appeal.

¶ 72    During oral argument, defendant's appellate counsel, for the first time, argued that defense counsel objected to the trial court's exclusion of individuals, including defendant's family, from the courtroom during jury selection. The following conversation took place outside the presence of the jury venire prior to the first striking conference:

"THE COURT: All right. There's another issue that was to be brought on the record. I think some members of possibly [defendant's] family and/or the victim's family I think were wanting to come into the courtroom which is packed with people. And the Court has ordered that no one is to come in there other than the jury veniremen until we have a jury selected. So, is that agreeable to you, [State]?
        [THE STATE]: Yes, sir.
        THE COURT: [Defense counsel]?
        [DEFENSE COUNSEL]: It is my understanding that there is [ ] an exception to the right to remain a public trial.
        THE COURT: Right. All right then. We're ready. We will take them in groups of four."

27

Even assuming that defense counsel's comment constituted an objection, which the record does not support, defendant failed to raise this issue in a posttrial motion. As such, defendant forfeited this issue on review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (failure to object to the error at trial and raise the error in a posttrial motion results in forfeiture). Despite recognizing that a defendant may argue plain error for the first time in a reply brief, defendant failed to present argument on how the plain-error doctrine is satisfied in the present case. Defendant, thus, forfeited plain-error review. *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010). Here, similar to *People v. Radford*, 2020 IL 123975, ¶¶ 22, 42, where our supreme court did not excuse the defendant's forfeiture for failing to object to the partial closing of the courtroom during jury selection and raising the issue in a posttrial motion, we, too, decline to excuse forfeiture, especially where defendant failed to address plain error.

¶ 73                        C. Ineffective Assistance of Counsel

¶ 74    Next, defendant argues that defense counsel rendered ineffective assistance of counsel by conceding to the State's motion *in limine* to bar evidence of Jamarco's character for violence. Defendant asserts that defense counsel's "concession prevented [defendant] from presenting a complete defense and deprived him of a fair trial," claiming that "relevant and admissible *Lynch* material was crucial to [defendant's] affirmative defense of self-defense." We disagree.

¶ 75    The sixth amendment (U.S. Const., amend. VI) guarantees a defendant the right to effective assistance of counsel at all critical stages of a criminal proceeding. *People v. Beasley*, 2017 IL App (4th) 150291, ¶ 26. To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate that (1) counsel's performance was objectively unreasonable, and (2) it is reasonably probable that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984); *People v. Evans*, 369 Ill. App.

28

3d 366, 383 (2006). Because a defendant must satisfy both prongs of *Strickland*, we may reject a claim of ineffective assistance without reaching the performance prong if defendant did not satisfy the prejudice prong. See *People v. Graham*, 206 Ill. 2d 465, 476 (2003).

¶ 76    The Illinois Supreme Court held in *People v. Lynch*, 104 Ill. 2d 194, 200 (1984), that "when the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor." *Lynch* held that a self-defense theory can be demonstrated by evidence of the victim's aggressive and violent character in one or both of these circumstances: (1) where the defendant claims that his own knowledge of the victim's violent tendencies affected the defendant's perceptions and reactions to the victim's behavior, or (2) to support the defendant's version of the facts when conflicting accounts are offered as to what happened between the defendant and the victim. *Id.* Under the first factor, the evidence is relevant only if the defendant knew of the victim's violent acts. *Id.* ("One can only consider facts one knows, *** and evidence of the victim's character is irrelevant to this [first] theory of self-defense unless the defendant knew of the victim's violent nature."). Under the second factor, testimony regarding the victim's character is circumstantial evidence that allows the jury to assess the events in question (*People v. Bedoya*, 288 Ill. App. 3d 226, 236 (1997)), and whether the defendant knew of evidence of the victim's propensity for violence at the time of the event is irrelevant (*Lynch*, 104 Ill. 2d at 200). To be admissible under either theory, the evidence must be relevant to the victim's violent behavior. See *People v. McGee*, 213 Ill. App. 3d 458, 469 (1991).

¶ 77    Prior to trial, defendant intended to introduce *Lynch* evidence, including the State's prior charges against Jamarco for the offenses of aggravated battery to a peace officer for spitting on Officer Kenny Imshaw (case No. 2006-CF-508) and unlawful restraint and disorderly conduct against Atavia Johnson, Jamarco's girlfriend at the time (case No. 2011-CF-300). With regard to

case No. 2006-CF-508, defense counsel sought to elicit evidence that Jamarco threatened Officers Imshaw and James Kemp during his arrest by allegedly making a "vague statement about rolling by and bang." With regard to case No. 2011-CF-300, defense counsel sought to elicit evidence that Jamarco refused to let Johnson leave in her car and also threatened to burn down her house. Importantly, however, the State never charged defendant with threatening Officer Kemp. In addition, defendant was never convicted of the offenses in case Nos. 2006-CF-508 and 2011-CF-300. The State subsequently filed a motion *in limine* requesting the trial court bar any evidence related to Jamarco's reputation, prior bad acts, and character.

¶ 78    At the hearing on the parties' motions, the trial court allowed defendant to testify about specific interactions that defendant personally experienced with Jamarco. The court, however, barred defense counsel from introducing evidence of Jamarco's prior instances of alleged violence concerning nonconvicted allegations contained in case Nos. 2006-CF-508 and 2011-CF-300. In so ruling, the court stated the following:

> "I think they would be overly prejudicial to the State because of their age. Um, one of them is 16 years old, the other one 11. Another thing is that they are at best allegations. They are—there's no conviction so this was not proven in a court of law or there was no guilty plea. I believe there was no actual—from what I understand from what I am reading and what I have heard in arguments, there was no actual carrying out of the threats alleged."

¶ 79    During trial, defendant testified in detail that Jamarco threatened him on six separate instances, five of which Jamarco threatened defendant with a gun. Defense counsel then questioned defendant about Jamarco's reputation in the community, specifically why defendant never reported these instances of violence, at which point defendant stated that Jamarco "threatened the police officers before." Following the State's objection, defense counsel attempted to lay foundation for reputation evidence by soliciting the following, outside the presence of the jury, as an offer of proof regarding defendant's generalized reputation:

30

"[DEFENSE COUNSEL]: Okay. How long have you known Jamarco?

THE DEFENDANT: All my life.

[DEFENSE COUNSEL]: Okay. You previously said on direct that you went to school together?

THE DEFENDANT: Yes, ma'am.

[DEFENSE COUNSEL]: Previously said on direct that you *** grew up in the same neighborhood?

THE DEFENDANT: Yes, ma'am.

[DEFENSE COUNSEL]: Did you hang around the same people?

THE DEFENDANT: Yes, ma'am.

[DEFENSE COUNSEL]: Are you aware of his associates within your neighborhood?

THE DEFENDANT: Yes, ma'am.

* * *

[DEFENSE COUNSEL]: Are you aware of his reputation within the community?

THE DEFENDANT: Yes, ma'am.

[DEFENSE COUNSEL]: How are you aware of his reputation within the community?

THE DEFENDANT: Because I know—everybody know [*sic*] each other around here to be honest, and I—we hang around the same people. He had threatened friends of mine. I know friends of his that we don't hang around. Like, we all know each other around here, and we all hang around in the same parts of the neighborhood.

[DEFENSE COUNSEL]: Without going into specific details, what do you know his reputation for violence to be?

THE DEFENDANT: That he's violent. That he is known to carry guns. He's known for shooting at people.

* * *

[DEFENSE COUNSEL]: Did the reputation of just he's a violent person, again not getting into specifics, affect your thoughts and your behaviors on July 4th, 2021?

THE DEFENDANT: Yes, ma'am."

Following this testimony, the State requested additional time to research reputation evidence, and defense counsel agreed. Following lunch, the State made an oral motion requesting the trial court exclude "generalized reputation character evidence" of Jamarco, citing Illinois Rule of Evidence 404 (Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)). The State asserted that "[d]efendant, through his personal knowledge, which was properly admitted under *Lynch* and the rule, talked about all the other incidences in which he thought that [Jamarco] might have a gun." The court reserved ruling in order to view additional video footage to determine if conflicting evidence existed as to the

initial aggressor. Defense counsel subsequently continued defendant's direct examination, and the State cross-examined defendant.

¶ 80　Following the State's lengthy and very detailed cross-examination, the trial court and the parties revisited the State's oral motion requesting the court exclude "generalized reputation character evidence" of Jamarco. The court reiterated its prior ruling to bar defendant from testifying to case Nos. 2006-CF-508 and 2011-CF-300, which dealt with evidence not necessarily known to defendant, before revisiting defense counsel's previous request to order defendant to disclose privileged information to the State concerning defendant's conversations with "associates in the community." The following colloquy took place between the trial court and defense counsel:

> "THE COURT: *** [A]re you asking then to present further as to the victim's reputation in the community for violence? Is that what you are asking to do?
> [DEFENSE COUNSEL]: If given the opportunity on redirect examination, I would ask the question. But pursuant to the *Buchanan* case that was cited that says that the court can rule that something is cumulative in terms of first prong *Lynch* evidence, I believe several times even on his cross examination [defendant] said people know Jamarco, I know Jamarco, I know how he is such that I think there was sufficient enough reputation brought out without going down the more complicated avenue of true reputation evidence without talking about specifics.
> THE COURT: Okay, so am I to understand that you are confessing the State's motion?
> [DEFENSE COUNSEL]: I would, at this point."

¶ 81　Given the above detail, we find defendant's argument meritless. Importantly, we agree with the State that defense counsel conceded to the State's oral motion requesting the trial court exclude "generalized reputation character evidence" of Jamarco. As stated above, the court barred defendant from testifying to evidence of Jamarco's charges in case Nos. 2006-CF-508 and 2011-CF-300. Thus, without the ability to ask defendant specifics about the State's prior charges in these cases—including that defendant threatened police officers before—defense counsel, determining that a court could bar cumulative evidence, stated her belief that the jury heard evidence that

32

"[defendant] said people know Jamarco, I know Jamarco, I know how he is such that I think there was sufficient enough reputation brought out."

¶ 82    The record demonstrates that defendant testified in detail about his personal experience with Jamarco's aggressive character, including six instances when defendant felt threatened by Jamarco—five of which included Jamarco pointing a gun at defendant. Testimony that demonstrated defendant's belief that Jamarco was violent, carried guns, and presented in a threatening manner multiple times leading up to July 4, 2021. Given the defense could not elicit specific details of case Nos. 2006-CF-508 and 2011-CF-300, due to the trial court's pretrial ruling barring such evidence, additional evidence of Jamarco's general reputation evidence was merely cumulative of that already presented to the jury. See *People v. Hayes*, 2011 IL App (1st) 100127, ¶ 42. Thus, we cannot conclude that defendant suffered prejudice by defense counsel's failure to introduce "as much evidence of [Jamarco's] violent character as possible." Therefore, defendant's ineffective assistance of counsel claim cannot stand.

¶ 83                         D. Prosecutorial Misconduct

¶ 84    Next, defendant argues that the State's pervasive misconduct, including shifting the burden, repeatedly misstating the evidence, making improper comments in opening statements, and improperly questioning defendant on cross-examination, denied defendant a fair trial.

¶ 85    We first address forfeiture. The record indicates that defendant failed to preserve most of the State's remarks he now challenges. Thus, these arguments are forfeited. *Enoch*, 122 Ill. 2d at 186; see also *People v. Sebby*, 2017 IL 119445, ¶ 48.

¶ 86    First, defendant forfeited the argument that the State, specifically Attorney Sean Featherstun, engaged in pervasive misconduct by objecting to defense counsel's motion to appoint a special prosecutor and motion to continue. Defendant did not allege prosecutorial misconduct in

33

his posttrial motion. Instead, defendant argued that the trial court erred by denying defendant's motion to appoint a special prosecutor and motion to continue and supplement defendant's motion to continue. Next, by failing to object at trial and raise the issue in a posttrial motion, defendant forfeited review of his argument that the State's comments during opening statements "substantially overstated the evidence," including that defendant "stalked," "chased," and "ambushed" Jamarco, defendant displayed a gun "when he's not even engaged with" Jamarco, and that Jamarco "[wa]s on the ground" within seven minutes from the time defendant arrived at the bar. Next, by failing to raise the issue in a posttrial motion, defendant forfeited review of his argument that the State engaged in prosecutorial misconduct by interjecting inflammatory and inappropriate commentary and objections during defendant's testimony on direct and cross-examination.

¶ 87 In response to the State's forfeiture argument, defendant referenced plain error in his reply brief. See *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010) (arguing plain error in a reply brief is sufficient to allow a reviewing court to review the issue of plain error (citing *People v. Williams*, 193 Ill. 2d 306, 347-48 (2000))). Although defendant requests this court review these issues of prosecutorial misconduct under the second prong of plain error, defendant failed to present argument on how the second prong of the plain-error doctrine is satisfied. Rather, defendant argues that the State, arguing only that defendant forfeited review, failed to address defendant's substantive arguments contained in his opening brief. Defendant, thus, forfeited plain-error review. *Hillier*, 237 Ill. 2d at 545-46.

¶ 88 The only issue defendant preserved, as the State correctly points out, is his argument that the State engaged in prosecutorial misconduct by improperly shifting the burden of proof in rebuttal closing argument.

¶ 89    A defendant arguing that reversal of his conviction is warranted on the basis of improper closing argument faces a difficult burden. *People v. Gutierrez*, 402 Ill. App. 3d 866, 895 (2010). Even when a defendant objects at trial to all of the remarks he challenges on appeal, reversal is warranted only if those remarks resulted in substantial prejudice to the defendant. *People v. Abadia*, 328 Ill. App. 3d 669, 678 (2001). If a prosecutor's remarks have the effect of undermining the entire trial, reversal for a new trial is warranted. *People v. Brooks*, 345 Ill. App. 3d 945, 953 (2004).

¶ 90    Prosecutors generally have wide latitude in closing arguments and may comment on the evidence and any reasonable inferences arising from the evidence, even improper remarks do not merit reversal unless they result in substantial prejudice to the defendant. *People v. Perry*, 224 Ill. 2d 312, 347 (2007); *People v. Kitchen*, 159 Ill. 2d 1, 38 (1994). During closing argument, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence, even if the inferences reflect negatively on the defendant (*Perry*, 224 Ill. 2d at 347), respond to comments made by defense counsel that invited response, and comment on the credibility of witnesses. *People v. Rader*, 178 Ill. App. 3d 453, 466 (1988). We consider statements in the context of the closing arguments as a whole instead of examining the contested phrases in a vacuum. *Perry*, 224 Ill. 2d at 347; *Kitchen*, 159 Ill. 2d at 38; *People v. Blue*, 189 Ill. 2d 99, 139 (2000).

¶ 91    Defendant argues that the State's comments below "absolutely and improperly shifted the burden of proof" during the State's rebuttal closing:

> "So what else is there that could have told you that he reached for a gun? He names his cousin. He names his girlfriend. He tells you they are both standing right there. Where are they? If he was reaching for the gun, if he was threatening to kill them, if he's saying where *** is Chico, where is the cousin? Champagne Turner knows his real name, right? I mean, Amiyah Caldwell, that's his current girlfriend. If this is true, where are they?

35

Nobody is going to tell you that there was a threat because there wasn't a threat made. Nobody—"

Defense counsel objected, stating that the State's line of questioning "seemingly shifted the burden" and that defendant had no obligation to produce additional witnesses. In response, the State argued that the Illinois Supreme Court in *People v. Blakes*, 63 Ill. 2d 354 (1976), supported the State's argument in rebuttal by holding that "where a defendant testifies on cross examination that there's all of these people available. I get to ask about it. Not burden shifting." The trial court then took a moment to read the case. Subsequently, the court sustained defense counsel's objection "[o]ut of an abundance of caution." The State then asked the court to reconsider its ruling, stating, "I don't know what an abundance of caution means?" The court read the case again, at which time the court reversed its ruling, stating on the record: "I believe that this case does give the State the right to make the comment about the failure of the Defendant to present persons at trial that he referred to."

¶ 92    We first note that defendant indicated in his posttrial motion that the State "made a spectacle in front of the jury" with regard to producing case law concerning *Blakes*. Defense counsel objected to the State's questioning of defendant about his failure to produce witnesses. On appeal, defendant argues that the State committed prosecutorial misconduct by continuing to argue after the trial court sustained defense counsel's objections and argued on one instance for the court to reverse its ruling in front of the jury. Defendant did not object at trial to these issues, thus, he forfeited review of these issues. *Enoch*, 122 Ill. 2d at 186. Lastly, we conclude that the State's comments did not shift the burden of proof to the defendant. This court recognizes the importance of not allowing the State to make improper argument during rebuttal closing argument, leaving the defense without an opportunity to respond. See *People v. Green*, 209 Ill. App. 3d 233, 245 (1991). Moreover, the State always carries the burden of proving, beyond a reasonable doubt the elements

36

of the crime, and the State may never suggest that it has no burden of proof or attempt to shift the burden of proof to the defendant. *People v. Robinson*, 391 Ill. App. 3d 822, 841 (2009). However, if defense counsel's closing argument "provokes a response, the defendant cannot complain that the State's reply in rebuttal argument denied him a fair trial." *Id.*

¶ 93 Here, importantly, as the State pointed out on appeal, defense counsel stated the following during closing arguments, prior to the State's rebuttal:

> "Of all the people that were there, all of those people that we see on the surveillance, we heard from four people, one of whom was [defendant], and the three other people told you after the shot they did not see where Jamarco went. [Defendant] tells you that he saw Jamarco still on his feet, still reaching.
> * * *
> In a previous life, I did some journalism, and the rules are tell us the who, what, why, when, where, how if possible when telling a story. So what in this case is obvious? We know what happens from the video. We know what happens from the still shots. Jamarco approaches [defendant], his arm is moving, [defendant] fires. But when we go to the why, we only have [defendant]. Of all of those people who are on the parking lot at the Corner Tavern that night you heard from three of them. ***
> * * *
> Who else did you hear from of the up to 200 people who were at the bar that night?"

Defense counsel then provided detail from each of the three testifying witnesses, including Caldwell, Goldman, and Ballard, in an attempt to discredit their testimonies. As such, when viewing the context of the closing arguments as a whole instead of examining the contested phrases in a vacuum (*Perry*, 224 Ill. 2d at 347), the disputed remarks in the State's rebuttal argument are properly viewed as a response to defendant's argument during closing argument. See *People v. Legore*, 2013 IL App (2d) 111038, ¶ 57. We therefore cannot conclude that the State's remarks denied defendant a fair trial.

¶ 94 In addition, defendant argues that the State's comments following the trial court's ruling to overrule defense counsel's objection constituted prosecutorial misconduct that shifted the

37

burden: "I mean, I won't belabor the point or beat it to death, but these were people that were known and they are not here." The State then asserted:

> "Regarding the five stories that you heard, remember they were never reported to the police. There's been no testimony from any of the witnesses. There were nine of them named. I won't name all nine of them and deal with the objection issue again, but there were nine people named specifically by the Defendant who he knows, who he claimed had personal knowledge of what he claimed happened. You heard from zero of nine."

¶ 95    Importantly, although defense counsel stated in the posttrial motion that the State asked why defendant failed to call any witnesses present when Jamarco threatened him, defense counsel did not object to the State's comments at this time. As such, this issue is forfeited. *Enoch*, 122 Ill. 2d at 186.

¶ 96    Lastly, defendant argues that the State's misconduct created a pattern of unfairness and denied him a fair trial. Cumulative error is applicable only where errors that are not individually considered sufficiently grave to entitle the defendant to a new trial cumulatively "create a pervasive pattern of unfair prejudice to defendant's case." *People v. Mendez*, 318 Ill. App. 3d 1145, 1154 (2001) (citing *Blue*, 189 Ill. 2d at 139). Here, we find the defendant has not established cumulative error. Based on a review of the entirety of the record, we cannot conclude that these errors represent a pervasive pattern of unfair prejudice to the defendant's case. As a result, no cumulative error exists.

¶ 97                                E. Excessive Sentence

¶ 98    Finally, defendant argues that the trial court abused its discretion by imposing an 80-year *de facto* life sentence. For support, defendant contends that the court "rejected mitigation [evidence], including [defendant's] belief that he acted in self-defense, the six times Jamarco *** previously threatened [defendant], and [defendant's] expressions of remorse," misstated the facts in evidence, and also failed to consider defendant's rehabilitative potential. We disagree.

38

¶ 99 The trial court has broad discretionary powers in imposing a sentence, and the court's sentencing decision is entitled to great deference. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). The trial court is granted such deference because the trial court is generally in a better position than the reviewing court to determine the appropriate sentence. *Id.* The trial court "has the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Id.* (citing *People v. Streit*, 142 Ill. 2d 13, 19 (1991); *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977)). Accordingly, this court "must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *Id.* (citing *Streit*, 142 Ill. 2d at 19). Where, as here, an imposed "sentence falls within the statutory limits, it will not be overturned on appeal absent an abuse of discretion." *People v. Bunning*, 2018 IL App (5th) 150114, ¶ 16. "An abuse of discretion occurs only if a sentence greatly varies from the spirit and purpose of the law or where it is manifestly disproportionate to the nature of the offense." *Id.*

¶ 100 We construe defendant's argument as an invitation to reweigh the sentencing factors, which we decline to do. There is no indication in the record that the trial court failed to consider any of the mitigating evidence. The record reveals that the court reviewed all evidence presented, all factors in aggravation and mitigation, the presentence investigation report, the seriousness of defendant's offenses, and all arguments by the parties before imposing defendant's sentence. Importantly, the court is not required to recite and assign value to each factor it considered. *People v. Perkins*, 408 Ill. App. 3d 752, 763 (2011).

¶ 101 Defendant argues that the trial court failed to consider that he acted under strong provocation (730 ILCS 5/5-5-3.1(a)(3) (West 2020)) and that there were substantial grounds tending to exclude or justify his conduct (*id.* § 5-5-3.1(a)(4)). At sentencing, the court stated that

"the jury heard evidence that there was probably some provocation." The court proceeded to state, that besides evidence of some provocation, "I don't think what happened was strong enough provocation to justify the killing of [Jamarco]." Moreover, the court considered, and then determined, that substantial grounds tending to excuse defendant's killing of Jamarco with a gun did not exist, noting that "[m]aybe there were grounds to pop him in the nose *** . Whatever happened to settling things with our fists?" Thus, contrary to defendant's argument, the court did in fact consider defendant's argument that Jamarco provoked and justified him but did not believe defendant, and thus, gave little weight to defendant's arguments that he acted in self-defense. *People v. Latona*, 184 Ill. 2d 260, 272 (1998) (it is up to the trial court "to balance relevant factors and make a reasoned decision as to the appropriate punishment in each case").

¶ 102    Contrary to defendant's argument, we cannot conclude that the trial court abused its discretion by rejecting mitigation evidence, including defendant's rehabilitative potential, his genuine display of remorse, and research indicating that young males have developing brains to support defense counsel's argument that the court should not scrutinize defendant—a 29-year-old at the time of the offenses—as heavily as crimes committed by mature adults. A review of the sentencing hearing indicates that the court considered the mitigation evidence but ultimately gave little weight to defendant's arguments. Even though defendant believed that his genuine expression of remorse, as demonstrated by his trial testimony, his rehabilitative potential, and defense counsel's argument concerning defendant's developing brain merited a lesser sentence, the court was not required to agree. We must emphasize that these mitigation factors, as well as the court's consideration of defendant's relationship with his children, are not entitled to greater weight than the seriousness of the offense. *People v. Coleman*, 166 Ill. 2d 247, 261 (1995). Instead, the

seriousness of the offense is the most important factor the court considers in sentencing a defendant. *People v. Flores*, 404 Ill. App. 3d 155, 159 (2010).

¶ 103   Here, defendant shot at Jamarco's face with a gun, initially missing Jamarco. Defendant fired eight rounds with a crowd of 100 to 200 people nearby, which included defendant's girlfriend, who was positioned in between defendant and Jamarco at the time defendant fired the first shot. Following the first shot, defendant proceeded to shoot eight times in the direction of Jamarco, killing him, and also, as the trial court stated, in the "direction of a building occupied by bar patrons." In addition, the court noted that defendant committed these acts while on parole for a prior gun charge. The court sentenced defendant to 35 years on the first degree murder conviction—a sentence within the sentencing range of 20 to 60 years—with a mandatory 35-year firearm enhancement. Additionally, the court imposed a 10-year sentence for armed habitual criminal to run consecutively with the first degree murder conviction. We cannot say that the sentence imposed was "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 209; *Bunning*, 2018 IL App (5th) 150114, ¶ 16.

¶ 104   Lastly, we reject defendant's argument that his sentencing proceeding was rendered unfair by the trial court misstating facts. As stated above, the court, after viewing the video evidence, did not believe defendant's argument that he acted in self-defense. Even though defendant believed that the court should have given weight to Jamarco's alleged prior threats and defendant's belief that he feared he was in danger because of such threats, the court was not required to agree with him. Instead, the court noted that "the evidence showed that, as has been pointed out, there was some sort of problem between you two fellows, and you went there it appeared to me looking for a fight and armed, and so I'm considering that." Moreover, defendant asserts that the court

misstated the forensic evidence that Jamarco "was killed from a shot in the back, which meant that he 'was turned around and either diving down to the ground or running hunkered over.' " However, defendant in fact misstates the court. The court stated: "The victim was shot in the back." The court then proceeded to state that "a bullet [went] through his buttocks *** up through his body and killed him that way. So he was turned around and either diving down to the ground or running hunkered over." Although Dr. Feeney confirmed on cross-examination that an injury to Jamarco's right hip could have taken place if Jamarco turned his right side toward defendant and bent over, video evidence demonstrated that defendant shot Jamarco multiple times as the victim ran away from him with his back to defendant. As such, we reject defendant's arguments that the trial court relied on improper statements of evidence in fashioning defendant's sentence.

¶ 105   The trial court's determination that an 80-year sentence was warranted fell squarely within the sentencing range and was sufficiently supported by the evidence. We, thus, cannot find that the court's sentence was excessive or based on improper statements of evidence. Accordingly, the court did not abuse its discretion by sentencing defendant to 80 years for the offenses of first degree murder, aggravated discharge of a firearm, and armed habitual criminal.

¶ 106                                   III. Conclusion

¶ 107   For the reasons stated, we affirm the judgment and sentence of the Jefferson County circuit court.


¶ 108   Affirmed.